UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| THOMAS W. MCNAMARA, as the Court-Appointed Receiver for SSM Group, LLC; CMG Group, LLC; DJR Group, LLC; BCD Group, LLC; Hydra Financial Limited Fund I; Hydra Financial Limited Fund II; Hydra Financial Limited Fund III; Hydra Financial Limited Fund IV; River Elk Services, LLC; OSL Marketing, Inc., a/k/a OSL Group, Inc.; and related subsidiaries and affiliates,<br><br>        Plaintiff,<br><br>    v.<br><br>KATTEN MUCHIN ROSENMAN LLP,<br><br>        Defendant. | CASE NO. _____<br><br>JURY TRIAL DEMANDED<br><br>Related Case: *Consumer Financial Protection Bureau v. Moseley*, et al., U.S.D.C. (W.D. Mo.) Case No. 4:14-00789-CV-W-DW |

### COMPLAINT

Plaintiff, Thomas W. McNamara (the "Receiver" or "Plaintiff"), in his capacity as the Court-Appointed Receiver for SSM Group, LLC; CMG Group, LLC; DJR Group, LLC; BCD Group, LLC; Hydra Financial Limited Fund I; Hydra Financial Limited Fund II; Hydra Financial Limited Fund III; Hydra Financial Limited Fund IV; River Elk Services, LLC; OSL Marketing, Inc., a/k/a OSL Group, Inc.; and related subsidiaries and affiliates (collectively, the "Receivership Entities"), hereby brings this Complaint against Defendant Katten Muchin Rosenman LLP ("Katten" or "Defendant") and alleges the following:

### INTRODUCTION

1.    The Receiver brings this Complaint for attorney malpractice and breach of fiduciary duty against Katten for negligent advice as to the applicability of the Consumer Financial Protection Act of 2010 (the "CFPA") to the Receivership Entities' payday lending business and loan documents, resulting in a lawsuit against them by the Consumer Financial Protection Bureau ("CFPB") and related monetary exposure.

2.     Until 2013, the Receivership Entities operated a payday lending business under the common ownership and control of Richard Moseley, Sr. ("Moseley Sr.") and his son, Richard Moseley, Jr. ("Moseley Jr.").[1]

3.     From August 2009 until the present, Katten has held itself out to the public to be skilled in connection with regulatory matters affecting the business of payday lending.

4.     From August 2009 until at least December 2012, the Receivership Entities retained Katten and its lawyers to provide regulatory advice and legal representation regarding their payday lending business.

5.     In September 2014, the Receivership Entities, Moseley Sr., Moseley Jr., a third individual, and various entities were sued by the CFPB in an action entitled *Consumer Financial Protection Bureau v. Moseley, et al*., U.S.D.C. (W.D. Mo.) Case No. 4:14-00789-CV-W-DW ("*CFPB v. Moseley*").  The CFPB alleges the Receivership Entities violated federal law in three respects relevant to this malpractice case:

a.     That the Receivership Entities' loan documents failed to clearly disclose to consumers an automatic renewal provision, which significantly increased the cost of borrowing in violation of the Truth in Lending Act and its implementing regulation, known as "Regulation Z" (collectively, "TILA");

b.     That the Receivership Entities' loan documents conditioned the issuance of a loan on the consumer's agreement to repay by pre-authorized electronic payment in violation of the Electronic Funds Transfer Act and its implementing regulation, known as "Regulation E" (collectively, the "EFTA"); and

c.     That the Receivership Entities' loan documents violated the CFPA, which, among other things,  extended the applicability of TILA and the EFTA beyond lenders to

---

[1]  Modified business operations continued through related entities until 2014, but are not at issue here.

loan servicers and processors, and granted the CFPB the authority to sue for violations of such laws.

6.     The Receiver obtained the business records of the Receivership Entities and a copy of what Katten represented to be its complete client file for the Receivership Entities (the "client file").

7.     Upon reviewing these documents, the Receiver determined that Katten knew (and should have known) that the loan documents being used by the Receivership Entities violated TILA and the EFTA.

8.     Upon reviewing these documents, the Receiver further determined, although the Receivership Entities that acted as the "lenders" purported to be located offshore (in Nevis and New Zealand), Katten knew that the Receivership Entities that handled loan servicing and processing were always located in the United States.

9.     The fact that the customer service and processing entities were in the United States is significant because, as stated, the CFPA granted the CFPB the power to sue customer service and loan servicing entities for violations of consumer protection laws, including TILA and the EFTA.

10.    Therefore, once the CFPA went into effect (which was no later than July 2011), Katten was negligent in failing to advise the Receivership Entities that – because of the U.S. location of the servicing and processing entities – any loan documents they used had to be TILA and EFTA compliant, or all lending had to cease.

11.    As a result of Katten's malpractice and breach of its fiduciary obligations, the Receivership Entities now face a lawsuit, the expenses of such lawsuit and resulting receivership, and liability to the CFPB for payday lending activity based on loan documents that violated TILA, the EFTA, and the CFPA.  Had Katten provided non-negligent legal advice, the Receivership Entities could have either made the loan documents compliant or ceased business. Instead, by providing negligent legal advice, Katten caused millions of dollars in damages to the Receivership Entities, the exact amount of which will be proven at trial.

3

## PARTIES

12.     Plaintiff is the duly-appointed Receiver for the Receivership Entities pursuant to orders entered in *CFPB v. Moseley*. The District Court vested the Receiver with the full powers of an equity receiver and with enumerated powers, including the power to bring suit on behalf of the Receivership Entities. These powers are confirmed in the Stipulated Preliminary Injunction with Asset Freeze, Appointment of Receiver, Expedited Discovery, and Other Equitable Relief, entered by the Court in *CFPB v. Moseley* on October 3, 2014 (the "Preliminary Injunction").

13.     Defendant Katten is a limited liability partnership and law firm that has offices in, *inter alia*, California, Illinois, New York, North Carolina, Texas, and Washington, D.C.

## SUBJECT MATTER JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter under 28 U.S.C. § 1345 and 28 U.S.C. § 1367(a), and the doctrines of supplemental and ancillary jurisdiction. *See S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004) ("the receiver's complaint was brought to accomplish the objectives of the Receivership Order and was thus ancillary to the court's exclusive jurisdiction over the receivership estate").

15.     Venue in the Western District of Missouri is proper pursuant to 28 U.S.C. § 1391, because the Court retained jurisdiction of this matter for all purposes and appointed the Receiver in the Western District of Missouri on September 9, 2014, and because this proceeding is supplemental to *CFPB v. Moseley*. *See Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 n.6 (6th Cir. 1981) ("[W]here jurisdiction is ancillary, the post-jurisdictional consideration of venue is ancillary as well.")

## PERSONAL JURISDICTION

16.     The Court may exercise personal jurisdiction over Katten pursuant to 28 U.S.C. § 1692, because the damages sought to be recovered are assets of the Receivership under the Court's Orders issued in *CFPB v. Moseley*. As a result, the normal rules of *International Shoe* do not apply. *See Haile*, 657 F.2d at 821.

17.     That stated, even if *International Shoe* applied, this Court has general and specific personal jurisdiction over Katten because this is a malpractice lawsuit concerning legal services provided by Katten to the Receivership Entities where the legal services were primarily directed at the Receivership Entities' operations in Kansas City, Missouri.  Specifically, Katten provided legal services to the Receivership Entities based on a retainer letter with Receivership Entity OSL Marketing, Inc. ("OSL").  Katten knew OSL was located in Kansas City, Missouri, and directed the retainer letter and monthly bills to OSL at its Kansas City, Missouri addresses.  Katten also sent some of its invoices for legal services jointly to OSL and River Elk Services, LLC ("River Elk"), another Receivership Entity located in Kansas City, Missouri.  Further, Katten directed its legal advice and services to the Receivership Entities to Moseley Sr., as the representative of the Receivership Entities – and, all the while, Katten knew that Moseley Sr.'s primary place of business was Kansas City, Missouri.  Lastly, Katten frequently assisted the Receivership Entities in drafting responses to state regulatory inquiries sent to the Kansas City, Missouri addresses.  Katten thereby subjected itself to the personal jurisdiction in this Court as to this dispute.

## BACKGROUND

**A.      Overview of the Receivership Entities**

**1.      The Receivership Entities' Payday Lending Enterprise**

18.     Beginning several years prior to 2009, and continuing until imposition of the receivership in 2014, the Receivership Entities and related entities, under the direct or indirect ownership of Moseley Sr. and Moseley Jr., operated a payday lending enterprise that made loans exclusively to consumers located in the United States.

19.     The Receivership Entities identified in this Complaint are the entities that were directly involved in either making the payday loans to consumers, or providing loan servicing and processing for those loans, between 2011 and 2013.  These are defined below as the "Lending Entities" and the "Customer Service Entities."

5

### 2. The Lending Entities

20. From 2009 (and earlier) through the end of 2011, the Receivership Entities' payday lending was done in the name of Receivership Entities which are incorporated in Nevis: SSM Group, LLC ("SSM"); CMG Group, LLC ("CMG"); DJR Group, LLC ("DJR"); and BCD Group, LLC ("BCD") (collectively, the "Nevis Entities").

21. From January 1, 2012 until near the end of 2012, payday lending was done in the name of Receivership Entities Hydra Financial Limited Fund I, Hydra Financial Limited Fund II, Hydra Financial Limited Fund III, and Hydra Financial Limited Fund IV, which were incorporated in New Zealand (collectively, the "New Zealand Entities").[2] (Although the lending was made in the name of the New Zealand Entities during this time period, the Nevis Entities continued to play a role, as Katten was informed by Moseley Sr.)

22. In approximately late 2012, the payday lending activities reverted to the Nevis Entities, which continued until about August 2013.

23. The Nevis Entities and the New Zealand Entities are collectively referred to herein as the "Lending Entities."

24. The Lending Entities were operated under the direct or indirect ownership and control of Moseley Sr. and Moseley Jr. until they were placed under the control of the Receiver.

### 3. The Customer Service Entities

25. From 2009 to 2013, the Lending Entities used two domestic service companies to provide loan servicing and processing (which included customer service): OSL and River Elk (the "Customer Service Entities").

---

[2] The various fund names were trade names for a single entity: Hydra Financial Limited. However, in *CFPB v. Moseley*, each trade name is identified. For the sake of consistency, the Receiver has identified the trade names utilized. In doing so, however, he recognizes that ultimately the entity over which he was appointed was Hydra Financial Limited, and his suit and authority as Receiver embraces that ultimate entity as well as each trade name.

26.     From prior to August 2009 until approximately March 2011, the loan servicing and processing company was OSL.

27.     From approximately March or April 2011 through approximately August 2013, the loan servicing and processing company was River Elk.

28.     Both Customer Service Entities were incorporated in Missouri and maintained offices, employees, and mailing addresses in Kansas City, Missouri while they were in operation.

29.     Both Customer Service Entities were operated under the direct or indirect ownership and control of Moseley Sr. and Moseley Jr. until they were placed under the control of the Receiver.

**B.     Overview of the CFPB Lawsuit and the Receivership**

**1.     The CFPB Brings Suit and the Receivership Is Established**

30.     On September 8, 2014, the CFPB brought suit against the Receivership Entities, together with certain other entities, Moseley Sr., Moseley Jr., and Christopher Randazzo in *CFPB v. Moseley*.

31.     On September 9, 2014, the Court in *CFPB v. Moseley* entered a Temporary Restraining Order ("TRO") that appointed Plaintiff as a temporary receiver over the Receivership Entities (among other entities).

32.     On October 3, 2014, the Court in *CFPB v. Moseley* entered the Preliminary Injunction, which confirmed Plaintiff's appointment as receiver over the Receivership Entities.

33.     The Preliminary Injunction grants Plaintiff the full powers of an equity receiver over the Receivership Entities.  The Receiver further may "[i]nstitute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the Assets of the [Receivership Entities], or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order...."  Preliminary Injunction § XV(L).

7

**2.      The CFPB's Complaint Exposes the Receivership Entities to Liability for Violations of TILA, the EFTA, and the CFPA in their Loan Documents**

34.      Under the CFPB's September 8, 2014 complaint in *CFPB v. Moseley* (the "CFPB Complaint"), the Receivership Entities face joint and several liability to the CFPB that includes, but is not limited to, the amount of payday lending they conducted with, and amounts they received from, consumers.

35.      In Counts One, Three, and Five of the CFPB Complaint, the CFPB alleges that the Receivership Entities engaged in unauthorized loans in violation of the CFPA and TILA, and unauthorized Automated Clearing House ("ACH") transactions under the EFTA.  Based on the information presently known, the Receiver is *not* stating any malpractice claim against Katten with regard to these Counts.

36.      In Counts Two, Four, and Six of the CFPB Complaint, the CFPB alleges that, even where loans were authorized by consumers, the loan documents used by the Receivership Entities (which were reviewed and sanctioned by Katten) violated TILA, the EFTA, and the CFPA.  The Receiver's malpractice claim stem against Katten directly from these CFPB claims against the Receivership Entities concerning the authorized loans because these claims arose from the negligent advice given by Katten.

**a.      Katten Aided the Receivership Entities in Drafting the Loan Documents that the CFPB Alleges Violate TILA**

37.      The CFPB Complaint alleges that the Receivership Entities violated TILA because the loan terms and costs disclosures contained in the loan documents were deceptive.  Specifically, the loan documents included a prominent box that disclosed items such as the amount borrowed, interest rate, and total loan cost.  However, the projections contained in the box assumed that the consumer would repay the loan with a *single* simultaneous payment of principal, interest, and fees.  This disclosure failed to mention an automatic loan renewal term, which was improperly buried elsewhere in the loan documents.  That automatic renewal term had the effect of greatly increasing the cost of the borrowing because it meant most consumers

8

had their loans automatically roll over, incurring *repeated* finance charges without repayment of principal.

38.     Under TILA, covered entities must "provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrowers' rights." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998). TILA's implementing regulations require that these be "clearly and conspicuously" disclosed to the borrower. 12 C.F.R. § 1026.17.

39.     Because the Receivership Entities' loan documents disguised the true cost of borrowing, these documents – which were reviewed, revised, and approved by Katten beginning in March 2011 as described below – violated TILA. *See FTC v. AMG Servs.*, 29 F. Supp. 3d 1338, 1351 (D. Nev. 2014) (TILA violated where "the large prominent print in the TILA Box [in a loan agreement] implies that borrowers will incur one finance charge while the fine print creates a process under which multiple finance charges will be automatically incurred unless borrowers take affirmative action").

**b.      Katten Aided the Receivership Entities in Drafting the Loan Documents that the CFPB Alleges Violate the EFTA**

40.     The CFPB's Complaint also alleges that the Receivership Entities' loan documents violated the EFTA provision that is codified at 15 U.S.C. § 1693k(1). That provision provides that the extension of credit to a consumer *may not* be conditioned on a requirement that repayment be made by preauthorized electronic fund transfers.

41.     The preauthorized electronic payment prohibition is echoed in "Regulation E," which implements the EFTA. Among other things, Section 1005.10(e)(1) of Regulation E provides that "[n]o financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers, except for credit extended under an overdraft credit plan or extended to maintain a specified minimum balance in the consumer's account." 12 C.F.R. § 1005.10(e)(1).

42.     The loan documents used by the Receivership Entities here – which were reviewed, revised, and approved by Katten beginning in March 2011 as described below – required borrowers to agree to preauthorized electronic payments (also known as "ACH processing").   Some of these loans documents did recite that the electronic payment authorization was "voluntary," but since the loan documents did not offer consumers a way to obtain a loan without this agreeing to this preauthorization, they were not voluntary under the EFTA.  *See FTC v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 812 (D. S.D. 2013) (finding EFTA violated where "there is no language expressly stating that the extension of credit is not conditioned on agreement initially to EFT or explaining how a consumer might obtain a consumer loan from Defendants otherwise").

> c.     **Katten Aided the Receivership Entities in Drafting the Loan Documents that the CFPB Alleges Violate the CFPA**

43.     Lastly, the CFPB's Complaint alleges that the Receivership Entities' loan documents violated the CFPA.  (*E.g.* CFPB Complaint ¶ 78).  Critically, the CFPA allegations cover the Customer Service Entities' violations of TILA and the EFTA through the use of the loan documents that violated those statutes.

44.     Specifically, the CFPB's CFPA claim is based on 12 U.S.C. § 5536(a).  That section forbids any "covered person or service provider" from offering or providing "any financial product or service not in conformity with <u>Federal consumer financial law</u>[;] ... otherwise commit[ing] any act or omission in violation of a Federal consumer financial law; or ... engag[ing] in any unfair, deceptive, or abusive act or practice."  (Emphasis added).

45.     Under 12 U.S.C. § 5481(14), "[t]he term "Federal consumer financial law" includes "enumerated consumer laws."  The CFPA then defines "enumerated consumer laws" to include TILA.  *See* 12 U.S.C. § 5481(12)(O).  The CFPA also defines "enumerated consumer laws" to include the EFTA (with one inapplicable exception).  *See* 12 U.S.C. § 5481(12)(C).  In this manner, the CFPA extends TILA and the EFTA to any "covered person or service provider."

46.     CFPA section 1002, which is codified at 12 U.S.C. § 5481, then defines the terms "covered person" and "service provider."

47.     Based on these definitions, the Customer Service Entities, located in Kansas City, Missouri are "covered persons" and/or "service providers" which fall within the CFPA because they were under the common control of Moseley Sr. with the Lending Entities, and they acted as service providers for the Lending Entities. *See* 12 U.S.C. § 548.

48.     In the exercise of its professional duties, Katten should have recognized this fact and advised the Receivership Entities that the loan documents that the Customer Service Entities were servicing and processing had to be TILA-compliant and EFTA-compliant by no later than the date when the CFPA went into effect (which date was no later than July 2011). Instead, as detailed below, Katten utterly failed to identify this issue and instead in August 2011 (at least a month after the CFPA went into effect) affirmatively advised the Receivership Entities that their documents did not have to comply with TILA and the EFTA despite Katten knowing of the Kansas City, Missouri location of the Customer Service Entities.

C.      **Katten's Representation of the Receivership Entities**

1.      **Katten Formed an Attorney-Client Relationship with the Lending Entities and the Customer Service Entities**

49.     The Receivership Entities' relationship with Katten arose through a retainer letter dated August 5, 2009, and signed August 12, 2009. This letter was executed by Moseley Sr. on behalf of OSL, and Claudia Callaway ("Callaway"), a Katten partner who is chair of Katten's Consumer Finance Litigation practice, co-chair of the Class Action and Multidistrict Litigation practice on behalf of Katten. The retainer letter is referred to herein as the "Retainer Letter."

50.     The Retainer Letter states that OSL's address is in Kansas City, Missouri.

51.     According to the Retainer Letter, the scope of Katten's retention was to advise OSL "in connection with general regulatory work in connection with lending activities and/or regulations."

52.     At all relevant times, Callaway has been, and is a partner at Katten.  (Prior to August 2009, OSL briefly engaged Callaway while she was affiliated with a previous law firm. The Receiver does not assert any claims as to that prior law firm; all claims stated herein are expressly alleged to have arisen after Callaway joined Katten.)

53.     Callaway – who was the lead Katten partner on the matter – is the chair of Katten's Consumer Finance Litigation practice.  At all relevant times, Callaway's practice has included regularly advising clients regarding the Federal Trade Commission ("FTC"), the CFPB, and related federal laws that the FTC and/or the CFPB enforce, such as TILA, the EFTA, and the CFPA.  Callaway also conducts litigation on behalf of her clients with regard to federal consumer protection laws.  On Katten's website, Callaway's biography states she has represented clients before the CFPB "since it was established," and that she "helps clients navigate the hurdles, pitfalls and opportunities available to the numerous parties involved under the CFPB's jurisdiction."  Her biography also notes that she frequently handles cases involving the Dodd-Frank Act.  The CFPA, and the creation of the CFPB, are part of the Dodd-Frank Act.  Callaway and Katten have published electronic advisories regarding the CFPB, some even before the agency was in operation.

54.     Although Katten's only retainer letter is with OSL, Katten in fact provided services to, and for the benefit of, numerous Receivership Entities between 2009 and 2012.  In this manner, it formed an attorney-client relationship with all of the Lending Entities and Customer Service Entities and/or otherwise assumed the duties that an attorney owes to a client as to all such entities.  This included, but is not limited to, Katten drafting loan documents for use by all of the Lending Entities and Customer Service Entities.  It also included Katten sending letters to State regulators with regard to inquiries and claims against the Lending Entities and Customer Service Entities, in which letters Katten specifically stated that it was legal counsel for various Lending Entities and Customer Service Entities.

55.     Katten's invoices for legal services between 2010 and 2012 further confirm that its representation included all of the Lending Entities and Customer Service Entities because

these bills included services provided for the benefit of all of the Receivership Entities. In fact, beginning in late 2011, Katten addressed its bills to both Kansas City Missouri Customer Service Entities (OSL and River Elk).

### 2. The Scope of Katten's Activities prior to February 2011

56.     Based on the information presently available to the Receiver, from 2009 until late February 2011, Katten's representation of the Receivership Entities was focused on responding to state regulatory inquiries regarding the Receivership Entities' payday lending activities.

57.     During that time, Katten knew that the then-in-use Customer Service Entity, OSL, was incorporated and located in Kansas City, Missouri.

58.     During that time, Katten further knew that, although the Nevis Entities claimed to be overseas, loan servicing and processing were performed by OSL, in Kansas City, Missouri.

59.     During this time, Katten's only client contact was Moseley Sr., who Katten knew had offices in Kansas City, Missouri, and who Katten knew was using a phone number with a Kansas City, Missouri area code.

### 3. In Early 2011, Katten Began to Advise the Receivership Entities regarding the Structure and Payday Lending Loan Documents that Were Then Used through December 2011 by the Nevis Entities

60.     Congress had adopted the CFPA in 2010, and it was scheduled to go into effect in 2011. As a result, by early 2011, major law firms (including Katten itself) that provided advice to clients with regard to regulatory matters that would be affected by the CFPA had begun to regularly publish bulletins and client-alerts regarding the CFPA. The reason for bulletins and client-alerts was that the CFPA (and resulting creation of the CFPB) was going to lead to very significant changes in the relevant laws governing companies in the consumer financial products space (including the payday lending space).

61.     It was against this backdrop that, on February 25, 2011, Moseley Sr. asked Katten via email for advice with regard to changing the business model and the loan documents used by the Receivership Entities.

62.     As will be discussed below, Katten in fact did at that time agree to assist the Receivership Entities with regard to such matters – but in doing so, it failed to ensure that it was providing advice that was consistent with the impending implementation of the CFPA.

63.     When Moseley Sr. sent his February 25, 2011 email, Callaway responded that same day, stating she was about to reach out to Moseley Sr. on just this point, *i.e.*, "the necessity of changing your business model to ensure that you are truly 'offshore' or, if operating in the US, you are operating in accord with US law."

64.     Shortly after these emails were exchanged, Callaway and a Katten associate (the "Katten Associate") had a phone call with Moseley Sr. about the Receivership Entities' business model and loan documents.

65.     On March 4, 2011, Moseley Sr. wrote to Katten stating he was looking into forming a new processing entity to replace OSL, and at least one reason to do so was to remove the word "marketing" from the name of the new entity, which had been advised by Katten.  In that email, Moseley Sr. asked Katten if there was any benefit in incorporating the processing entity offshore.  Katten's client file does not record any response to this inquiry.

66.     Moseley Sr.'s March 4, 2011 email also provided Katten with a copy of the Master Services agreement that OSL (based in Kansas City, Missouri) used with the Nevis lenders, further disclosing the nature of this structure to Katten.

67.     On March 8, 2011, Katten sent an email to Moseley Sr. attaching revised versions of the loan documents used by the Nevis Entities and the Customer Service Entities.  The email states that "we [Katten] have tried to make all disclosures required by US law, but do not know that a court [or] a regulator would find that it complies."  In fact, however, the revised loan documents that Katten sent to the Receivership Entities on March 8, 2011, on their face violate TILA, the EFTA, and the CFPA (which, by that time, Katten knew was going into effect shortly).  Katten's email with these loan documents did not identify these legal violations.

68.     On March 11, 2011, Moseley Sr. wrote to Katten to inform them that he would be shutting down OSL and replacing it with River Elk, another Missouri entity located in Kansas

City, Missouri. Within the next month or so, Moseley Sr. did in fact replace OSL with River Elk.

69. Like OSL, River Elk was formed as an entity in the State of Missouri, with employees working exclusively in a Kansas City, Missouri office. Katten was aware of these facts.

70. On March 14, 2011, Moseley Sr. followed up on Katten's March 8 email that attached the revised loan documents, stating he would make some changes, but not use the wholesale changes for the Nevis Entities, and that he would implement larger changes in the loan documents for use in the New Zealand structure.

71. On March 21, 2011, Moseley Sr. sent back to Katten revised versions of the loan documents that he intended to use for the Receivership Entities on an interim basis. These revised loan documents on their face violate TILA, the EFTA, and the CFPA (which, by that time, Katten knew was going into effect shortly).

72. On March 31, 2011, Katten again sent an email to Moseley Sr. attaching revised versions of the loan documents used by the Nevis Entities and the Customer Service Entities. These revised loan documents again on their face violate TILA, the EFTA, and the CFPA (which, by that time, Katten knew was going into effect shortly). Katten's email with these loan documents did not identify these legal violations.

73. From approximately April 2011 until December 31, 2011, the Nevis Entities and the Customer Service Entities used versions of these Katten-reviewed loan documents that contained the violations of TILA, the EFTA, and the CFPA. At no time in the Katten client file is there any indication that Katten informed the Receivership Entities of the specific legal violations of these laws, or of the impact of the impending implementation of the CFPA to these documents.

**4.      Beginning in May 2011, Katten Advised the Lending Entities and the Customer Service Entities Regarding the New Zealand Entities' Payday Lending Loan Documents**

74.      At the same time as he was updating the Nevis documents with Katten's assistance, Moseley Sr. had begun executing a plan to secure a lending license in New Zealand, and to have future lending switched to new lending entities licensed in New Zealand.  At around this time, Moseley Sr. shared this plan with Callaway, and she encouraged him to pursue it.

75.      On May 16, 2011, Moseley Sr. wrote to Callaway, stating:

I am still messing with New Zealand. I have found a third provider that I am going with and that I now feel comfortable with at this moment. Please don't contact the provider that I sent you email on as I have bothered him enough. The information that he gave me is good, but he is overpriced for what I need.

I am down to wiring funds to get the FSP setup and registered. I want to make sure that you understand the business model and the flow so you can advise and write the proper disclosures accordingly.

A New Zealand company will be formed as an LLC and registered on the FSP Registry. It will have a trading name with the name of each Nevis Lender that we have now and any new ones in the future. A hypothetical name would be "Bluebird Financial D/B/A CMG Group LLC". The Licensed entity is a New Zealand Financial Service Provider and the lender is domiciled in Nevis. The Loan would be originated from the Bahamas.

Please confirm that you can write the proper disclosures and language for Governing Law for this to all make sense so I can proceed to put this to bed. Thanks.

(Emphasis added).

76.      Callaway responded that day, stating "Confirmed."

77.      On June 8, 2011, Moseley Sr. sent the draft loan documents that would be used for the New Zealand lending structure to Katten to revise.  Callaway responded that day, copying the Katten Associate, and a Katten Of Counsel attorney (the "Katten Of Counsel").

78.      Both the Katten Of Counsel and the Katten Associate were working at all times relevant to this Complaint under the direction of Callaway.

79.      As part of Katten's production of its client file, it produced documents labeled as the Katten Of Counsel's files, with handwritten comments on some of those documents.  On

information and belief, the handwriting on those documents is the Katten Of Counsel's. One of those documents with handwriting is a printout of Moseley Sr.'s June 8, 2011 email and attachments. On the printout of the email itself, there are several handwritten notes.

80. One of those handwritten notes reads: "No refund of excess FC [final charge] if early prepay → likely abusive." On information and belief, this is in part a reference to the TILA violation created by how finance charges were disclosed and assessed under the loan documents.

81. A second handwritten note circles Moseley Sr.'s office and cell numbers on his email signature block (which numbers have the U.S. area code for Kansas City, Missouri), and states: "He better not have anything on US soil." On information and belief, this is a reference to the potential exposure any lending company *or affiliated entity* could face under federal consumer laws (including, but not limited to, the CFPA) if it is operating in the United States in violation of U.S. law.

82. On information and belief, subsequent pages in this same document contain the Katten Of Counsel's handwritten edits to the loan documents and related materials. Some (but not all) of the subsequent pages of handwritten edits to the loan documents were transmitted to Moseley Sr. on August 22, 2011. However, there is no record in Katten's client file that the first page containing the notes regarding "potentially abusive" or not having anything on "US soil" were transmitted to the Receivership Entities.

83. Similar in nature to these handwritten notes are two emails. The first email is dated on June 10, 2011 and was sent by the Katten Of Counsel to Callaway and the Katten Associate. Based on the Katten client file, this email was never sent to the Receivership Entities. It reads in relevant part:

My overarching comments are as follows:

(1). First, I hope we have confirmed that EVERYTHING is offshore (servers, customer service, telephone numbers, etc).

(2). There is NO governing law section in this agreement. There needs to be one that references NZ law.

17

(3). There is an arbitration provision (which I have not reviewed because I assumed one of you would) that may not work at all given the attachments he provided about Financial Dispute Resolution at the back of the document. This needs to be thought through.

(4). I thought the automatic renewals unless there was an affirmative decline was just inviting trouble. I have tried to change that (client will likely not like what I have done but I drafted in accordance with CC's pigs/hogs theory).

I will ask Lisa to PDF to each of you tomorrow my handmarked notes. If there is a call tomorrow, I would be happy to be on it.

(Capitalization in original; underline added).

84.     The second email is dated June 10, 2011 and was sent by the Katten Of Counsel to Callaway and copied to the Katten Associate.  Based on the Katten client file, this email was never sent to the Receivership Entities.  It reads in relevant part:

You will get my PDF mark up in a few minutes but I wanted to tell you [Callaway] why I had such an issue with the disclosures as they were drafted.

Specifically, the agreement contemplated an automatic renewal at the end of the single installment loan.  In order to avoid the renewal, there was a form consumer had to send back.  In my mind, this created a back-door way to what is almost an installment loan because it was presumed that there would be rollovers. To me, there are issues around that with unfair and potentially abusive.  There are also disclosure issues because I think the FTC could argue that the disclosures were not really right because it was assumed in the agreement that there would be an automatic rollover and thus the entire TILA box (which I hesitate to call it because I know this will be construed under NZ law) is not right.

Of course, all of this begs the question that it is being conducted offshore so the FTC would not have jurisdiction, etc.  However, I think this type of agreement (as originally drafted) that could really pose a lot of problems.

(Underline in original).

85.     In sum, these internal Katten emails, dated June 10, 2011, raise questions directly as to the abusiveness of the loan rollover scheme under TILA, whether there is adequate disclosure under TILA, and whether the enterprise can really be treated as being overseas (even emphasizing that "customer service" had to be overseas – and Katten knew River Elk was located in Kansas City, Missouri).  These types of questions by the Katten Of Counsel should have caused a reasonable lawyer, in Callaway's position and with her specialized knowledge of both her clients and of federal consumer protection laws, to identify the TILA and CFPA problems in the loan documents and in the overall structure of the Receivership Entities using the

18

Customer Service Entities in Kansas City, Missouri for customer service tasks. It also should have caused such a lawyer to advise the Receivership Entities that the structure and loan documents could not be lawful with the implementation of the CFPA. Katten's client file does not record any such advice being given.

86.     Instead, on July 15, 2011, Katten sent an email to Moseley Sr., attaching revised versions of the loan documents to be used by the Lending Entities and the Customer Service Entities in connection with the lending under the new, New Zealand structure. These revised loan documents on their face violate TILA, the EFTA, and the CFPA.

87.     On August 12, 2011, Moseley Sr. sent to Katten revised versions of the loan documents that he intended to use for the New Zealand model. These incorporated Katten's prior edits. But Katten's edits had not corrected the violations of TILA, the EFTA, and the CFPA, and therefore the revised versions Moseley Sr. sent continued to violate TILA, the EFTA, and the CFPA.

88.     In the creation of these drafts, Moseley Sr. worked from exemplars that referenced TILA and, in his August 12, 2011 email to Katten, he requested that a reference to TILA in the draft document be edited by Katten. The Katten Associate responded to Moseley Sr.'s request for revisions by stating "Will do."

89.     On August 21, 2011, the Katten Of Counsel, wrote to Moseley Sr., stating:

I reviewed your agreement some time ago but it clearly looks like it did not get back to you. I will be sure you get it Monday.

Two questions are noted on my review, however: (1) do you give your consumers a privacy policy that is compliant with the Gramm Leach Bliley Act[3]; and (2) are you text messaging your customers (either currently or in the future you plan to).

It may be that we need to draft something for both of those but I don't want to go down that path until I hear from you. Sorry for the confusion with all of this but you will have the Katten comments Monday.

_____

[3] This U.S. law relates to privacy and disclosures of how consumer data will shared.

90.     These questions by the Katten Of Counsel are notable in that both questions contemplate application of U.S. law.  This is inconsistent with the advice Katten otherwise gave that the Receivership Entities should not worry about U.S. law as to TILA and the EFTA.  In the client file, Katten never identified, or explained, the inconsistency in the advice given.

91.     On August 22, 2011, the Katten Of Counsel (through her assistant) sent marked-up versions of the draft New Zealand loan documents to Moseley Sr., copying the Katten Associate.   These versions of the loan documents left intact the provisions that violated TILA, the EFTA, and the CFPA.  Yet, Katten's August 22, 2011 mark-up does address edits needed to comply with U.S. law regarding privacy disclosures.  Again, in the client file, Katten never identified, or explained, the inconsistency in the advice given.

92.     The revisions sent by the Katten Of Counsel on August 22, 2011 addressed an older draft of the loan documents that Moseley Sr. had provided in June 2011, and not the revised version he sent on August 12, 2011.  To correct this, on August 23, 2011, the Katten Of Counsel followed up by writing to Moseley Sr. with regard to her review of the most recent draft loan documents.   In this email, the Katten Of Counsel identified the auto-renewal structure of the loan documents – which are deceptive and violate TILA – stating:

> One structural point – the way this agreement is written, the Total of Payments is due on the Payment Due Date.  If the consumer either requests a renewal OR fails to pay the Total of Payments on the Payment Due Date (ie[sic], the ACH debit does not go through), then the consumer goes into Renewal.

93.     However, despite noting the existence of the provisions, the Katten client file does not record Katten informing the Receivership Entities of the TILA violation or the resulting implications under the CFPA for any U.S.-based processing and customer service entities. Moreover, in the same email, the Katten Of Counsel again identified *other* requirements of U.S. law (as it relates to privacy and military disclosures), which again contemplate application of U.S. law.   As stated, this is inconsistent with the advice Katten otherwise gave that the Receivership Entities should not worry about U.S. law.

94.     On August 23, 2011, the Katten Of Counsel emailed Moseley Sr. stating, in part, that the U.S. military disclosure in the loan documents was not quite correct and asking him if he wanted to correct this language. Moseley Sr. then asked her to provide the correct language. She sent it to him the next day and it was included in subsequent versions of the loan documents. This is notable in that, where Katten did state U.S. law required a specific change, the Receivership Entities implemented that change in the loan documents.

**5.     In August 2011, after the CFPA Had Gone into Effect, Katten Expressly Advised the Receivership Entities that the Loan Documents Did Not Have to Comply with TILA and the EFTA**

95.     On August 24, 2011, the Katten Of Counsel responded to further questions by Moseley Sr., stating in relevant part in an email:

> With respect to the 5th paragraph in the Electronic Consents section -- for a DE lender (or any US-based lender), that sentence is correct in terms of the fact that a borrower cannot be required to receive their loan funds via ACH. Specifically, 12 CFR 205.10(e), compulsory use, states that "no financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic funds transfers, except for credit extended under an overdraft credit plan or extended to maintain a specified minimum balance in a consumer's account." Again, this is based upon US law and you are a NZ lender. As such, it is really up to you as to whether you keep the sentence as is (which would be required under US law) or modify it to fit your business model (assuming that NZ laws allows compulsory use, which I do not know).

(Emphasis added).

96.     In other words, in the August 24, 2011 email, the Katten Of Counsel expressly flagged the EFTA issue, but advised the Receivership Entities that they did not have to comply with this aspect of the EFTA, and failed to advise the Receivership Entities as to the implications under the CFPA for the Customer Service Entities.

97.     On that same day, the Katten Associate also wrote to Moseley Sr. regarding the loan documents. The Katten Associate stated in relevant part in an email:

> I reviewed the FDR website you emailed me regarding New Zealand's mandatory financial dispute resolution scheme. Based on our discussions and information contained on the FDR website, I drafted the disclosure below to be inserted into your arbitration agreement. I did not see any requirement regarding a disclosure (such that it contain specific language, for example, or that you even include

21

a disclosure).   However, I am not familiar with New Zealand law, and New Zealand may have a specific requirements regarding the wording, placement, font and timing of this disclosure.  (By way of comparison, the US Truth In Lending Act imposes very specific requirements about the font size and placement of interest rate and cost of credit disclosures in US loan agreements, and New Zealand law conceivably could contain similar requirements for the FDR disclosure).  Accordingly, you should consult with your New Zealand counsel to confirm that this disclosure and the loan documents comply with New Zealand law.

(Emphasis added).

98.     In other words, the Katten Associate expressly flagged the TILA disclosure issue, but advised the Receivership Entities that they did not have to comply with this aspect of TILA, despite the fact that CFPA had gone into effect (at the latest) one month earlier.

**6.     Katten Continued to Advise the Receivership Entities that the New Zealand Model Would Be Defensible – Even Though It Knew the Receivership Entities Still Had Operations in Missouri**

99.     On August 26, 2011, the Katten Associate sent to Moseley Sr. an email, copying Callaway, about an investigative subpoena received at OSL/River Elk's Kansas City, Missouri address from the State of Missouri.  In that email, the Katten Associate stated in relevant part:

Regarding the Missouri demand (and regulatory demands and letters in general), and as we have discussed previously by telephone, your current business model places you in a difficult situation.   Although your lending operations are conducted from Nevis, **your customer service operations are based in the U.S. Customers and regulators are aware of the U.S. address of your customer service center** (you told me this information is circulated on consumer debt management "blogs"), and have directed complaints and other materials intended for the Nevis lending entities to the U.S. address.  This has resulted in you receiving letters addressed to the Nevis entities (DJR/CMG/SSM), 2 East Gregory, Kansas City, MO.  As you know, the Missouri Investigative Demand was sent to "DJR Group, 2 East Gregory."

This puts you in a tight spot, as we also discussed: if you ignore the complaints and regulators' letters, you risk angering them and inviting tougher regulatory action, including cease-and-desists.  But if you respond, then you open yourself to the claims that the Nevis entities actually have a U.S. presence.  This is compounded by the fact that your lending entities were not licensed.  Thus far, you have generally elected to respond to the complaints, albeit while including language in the response letters stating that the lending entity is not located in the US and that the regulator's letter was "forwarded" to the lending entity.  During our telephone call yesterday, you stated that you would advise **your customer service employees in Missouri** going forward to not sign for certified letters addressed to DJR/SSM/CMG but sent to 2 East Gregory.

The Missouri demand underscores the perils of your present business model. As [Callaway] and I have both told you in the past, your business model carries substantial risks and is not one that we would have recommended (and in fact on a number of occasions we both recommended that you obtain a license). We are happy to see that you are moving forward with your New Zealand license. But for now, we need to deal with the facts as they stand.

I spoke to [Callaway] regarding the Missouri demand. Given these facts, whether you decide to respond is your decision, and not one we can make for you. That being the case, unless you tell me otherwise, I will refrain from preparing a response to the Missouri demand.

(Emphasis added).

100.    Notably, in this email, Katten recognized the existence of U.S.-based customer service operations of the Customer Service Entities, and the fact that Mosley Sr. controlled such entities entity and had "advised [his] customer service employees in Missouri" to take certain actions. Katten then goes on to state that securing a New Zealand lending license will resolve this issue – while disregarding the ongoing problem caused by having U.S.-based customer service. In this manner, Katten had failed to identify the fact that the U.S. presence of the Customer Service Entities meant that they were directly subject to the CFPA (and, through it, TILA and the EFTA) regardless of the status of the Lending Entities.

101.    On August 26, 2011, Moseley Sr. again sent a revised version of the loan documents, incorporating Katten's prior changes. The revised loan documents still violated TILA, the EFTA, and the CFPA.

102.    On August 29, 2011, the Katten Of Counsel wrote back stating she had reviewed the revised document. Again, no advice was given to correct the defects under TILA, the EFTA, or the CFPA.

103.    On September 1, 2011, Callaway emailed a lawyer from a Missouri law firm who was assisting the Receivership Entities, explaining that Katten was aware of the numerous consumer and regulator complaints claiming DJR (a Nevis Entity) was at 2 East Gregory in Kansas City, Missouri (the address used by OSL and River Elk). Callaway stated: "Yes, we are aware of this -- this stems from DJR being listed on the blogs at 2 E. Gregory Blvd. We still take the position that the lending doesn't occur in Missouri, etc."

104.     This September 1, 2011 email is consistent with Katten's emphasis to the Receivership Entities that what mattered was where the lending entity was located.  It also is consistent with Katten's correspondence with State regulators, where Katten's focus was consistently on whether a particular state had personal jurisdiction over the Receivership Entities.  Katten's client file does not reflect any separate research on the applicability of federal law.  This emphasis on the Lending Entities' location (and on State's laws and jurisdiction) neglected to consider both the CFPA and the Customer Service Entities' Kansas City, Missouri location.

105.     On September 7, 2011, the Katten Associate (copying Moseley Sr., Callaway, and the Katten Of Counsel) contacted counsel in New Zealand to arrange for the foreign counsel's retention by the Receivership Entities.  In relevant part, the Katten Associate summarized Katten's knowledge of the Receivership Entities' business as involving making "small, short-term unsecured loans to consumers in the United States via the Internet."

106.     On September 7, 2011, Moseley Sr. forwarded an email to the Katten Associate that Moseley Sr. had first sent to New Zealand counsel.  In that email, Moseley Sr. reaffirmed that, at least initially, loans would only be made to customers located in the U.S.

107.     During the rest of September 2011, Moseley Sr. obtained revisions to the loan documents from New Zealand counsel, which he shared with Katten.  Katten advised the Receivership Entities to make the changes recommended by New Zealand counsel.

108.     On October 14, 2011, Moseley Sr. sent the loan documents, as revised by New Zealand counsel, to Katten.  The revised loan documents continued to violate TILA, the EFTA, and the CFPA.

**7.     Katten Knew the New Zealand Loan Documents Were Put into Use – and Never Identified Their Legal Defects**

109.     On October 28, 2011, Moseley Sr. sent what he described as a close-to-final version of the New Zealand loan documents to the Katten Of Counsel and the Katten Associate

for their review. The revised loan documents continued to violate TILA, the EFTA, and the CFPA.

110. On October 30, 2011, the Katten Of Counsel sent limited edits to the loan documents, which did not address the TILA, EFTA, or CFPA defects, and indicated she had no other edits.

111. Moseley Sr. responded the next day, stating: "Thanks ... for getting back so promptly. I definitely respect your opinions and comments and will review them accordingly. I will await [the Katten Associate's] comments and then complete the final draft."

112. On November 6, 2011, Moseley Sr. re-attached the latest version of the loan documents in an email to the Katten Associate, and again solicited his input. The revised loan documents continued to violate TILA, the EFTA, and the CFPA.

113. On November 9, 2011, the Katten Associate responded, stating: "This [meaning the draft loan document Moseley Sr. sent him on November 6] looks fine to me. Note that as I am not licensed in New Zealand, I cannot comment with respect to issues pertaining to New Zealand law. Let me know if you have any questions. Thanks."

114. On November 9, 2011, Moseley Sr. responded to the Katten Associate, stating that New Zealand counsel has approved the documents in terms of New Zealand law, and that: "We will now be placing the document into our software so we can start our new business model."

115. In his November 9, 2011 email, Moseley Sr. specifically solicited an explanation from Katten as to why the New Zealand model was immune from U.S. law, stating:

> Now my next question relates to what the overview of our defense will be when we hear from the State AG's. Our customers who more often than not do not read the docs and "cut and paste" from various blogs that say it is not legal to lend in their state for whatever reason. [Callaway] told me from the beginning that she liked the business model and thought it was very defensible, but never really got into the specifics. Before we role [sic] this model out, I would like to have the legal line of defense explained in detail so I can determine how aggressive I want to be. I plan to go back into some states that we are not presently funding in.

(Emphasis added).

116. On November 28, 2011, having received no response, Moseley Sr. repeated his question to the Katten Associate, stating: "Could you please weigh in on my question below about our legal line of defense. Thanks."

117. On November 28, 2011, the Katten Associate passed on the earlier November 9, 2011 email to Callaway and the Katten Of Counsel, stating: "Can one or both of you contact Rick [Moseley Sr.] to discuss?  He is anxious to move forward with [the New Zealand Entities]. I spoke to him a bit, but recommended that he speak with you as well.  Thanks."  The only additional indications that Katten responded to this request in the client file are two billing entries.  The first, dated on November 28, 2011, is by the Katten Associate for a total of 0.6 hours.  It reads:  "Teleconference with client regarding New Zealand (.3); emails regarding same (.3)."  The second, dated on November 29, 2011, is by the Katten Of Counsel for 0.3 hours.  It reads:  "Participate in conference call with client regarding New Zealand model."  There is no indication in the Katten client file that the requested legal line of defense was set out in writing. (Later, in an email dated September 28, 2012, Moseley Sr. indicated to another attorney that Callaway never provided a detailed, written explanation of the legal argument).

118. There is no record in the client file that, at any time, Katten advised the Receivership Entities that the loan documents had to comply with TILA, the EFTA, or the CFPA, or that the Customer Service Entities, in particular, faced exposure under the CFPA. There also is no record of specific legal research on these issues in the client file.

119. On December 23, 2011, Moseley Sr. re-sent the New Zealand loan documents to the Katten Associate with a quick question regarding word choice.  The loan documents continued to violate TILA, the EFTA, and the CFPA.

120. On January 25, 2012, Moseley sent the New Zealand Entities' loan documents to the Katten Associate, indicating they are the documents they are "working with" (*i.e.*, using). The Katten Associate acknowledged receipt of the documents.  These loan documents continued to violate TILA, the EFTA, and the CFPA.

121.   On January 26, 2012, the Katten Associate sent Moseley Sr. the contact information for a new associate at Katten (the "Second Katten Associate").  The Second Katten Associate then assumed the role in the representation of the Receivership Entities previously played by the Katten Associate.  The Second Katten Associate also performed services for the Receivership Entities at the direction of, and under the supervision of, Callaway.

122.   On February 21, 2012, the Second Katten Associate sent Moseley Sr. an email about a Tennessee regulator's letter that had been delivered to and signed for at River Elk's Kansas City, Missouri address.  That email copied Callaway and stated in relevant part:

> Before sending out a response to the latest Tennessee letter, we wanted to get a little clarity on what exactly is at the Kansas City address?  It appears that one or both of the letters from Tennessee was signed for by somebody at the Kansas City address.   We need to be careful here because, as you know, in our communications with state regulators we maintain that CMG Group has no presence in the US.

123.   What is in part remarkable about this email is that Callaway (and Katten generally) already well knew that the Receivership Entities had their customer service offices in Kansas City, Missouri.  Yet, based on this email, the Second Katten Associate apparently had not been informed of this vital fact by Callaway before being assigned to the matter.

124.   On February 21, 2012, Moseley Sr. responded, stating:

> Ok.  OSL was at the KC address at one time.  They ceased operations in April 2011.  They were under contract with CMG to act as a call center and perform verification services for CMG Group LLC a Nevis registered lender.  OSL is not a lender nor has it ever been.  CMG does not have an office in the USA despite what all the blogs say.  We apparently signed for the letter as it was also addressed to OSL which was at one time located at 2 East Gregory.  We do not accept registered letters to this address if addressed to any Nevis entities only.

125.   This response once again put Katten on notice of that Moseley continued to operate  a U.S. office with sufficient contacts to the payday loan business that mail directed to OSL continued to be accepted.

126.   On March 2, 2012, Mosely Sr. and the Second Katten Associate exchanged emails regarding a response to a consumer complaint, in which emails the Second Katten

Associate made statements once again confirming that Katten knew that the Kansas City-based River Elk provide customer service and loan servicing.

127.    On March 21, 2012, Moseley Sr. wrote to the Second Katten Associate, following up on a March 7, 2012 email to the Katten Of Counsel, stating:

> We are considering collecting on our Hydra Financial debt in house. Would a wholly owned U.S. corporate subsidiary of Hydra Financial New Zealand be considered a "first party" collector of loans made by Hydra Financial New Zealand?

128.    On March 21, 2012, the Katten Of Counsel forcefully responded as follows:

> [Y]ou absolutely should NOT set up a US affiliate of the New Zealand company. You must keep everything offshore (including affiliates) to claim that you are truly offshore and that means that an offshore lender cannot have a US affiliate. There are other "offshore lenders" who have been caught in this type of morass (ie [sic], the Arkansas AG's pursuit of an offshore lender that answered his mail from Kansas City). If you want to create a separate NZ subsidiary, that would not jeopardize the model.

(Capitalization in original).

129.    What is significant about this response is that Katten knew that the Lending Entities *already* had a U.S. affiliate – the Customer Service Entity that was still in operation (River Elk). Indeed, throughout 2011-12, Katten assisted the Lending Entities and the Customer Service Entities in situations where regulators attempted to contact the Lending Entities at the Kansas City, Missouri address of the Customer Service Entities (OSL/River Elk). Yet, despite warning against creation of a U.S.-based debt collection company in this March 21, 2012 email, the client file contains no indication that Katten identified the risk faced by the Customer Service Entities in Kansas City, Missouri.

130.    On April 6, 2012, Moseley Sr. sent the current loan documents for Hydra to the Second Katten Associate, noting (correctly) that the documents were drafted with Katten's assistance. The loan documents continued to violate TILA, the EFTA, and the CFPA.

131.    On April 10, 2012, the Second Katten Associate, copying Callaway, emailed Moseley Sr. The subject of this email was an email that Moseley Sr. had received that contained

a notice of a complaint against the New Zealand Entities. In that regard, the Second Katten Associate stated:

> [Callaway]- correct me if I am wrong, but there is no responsive action to be taken at this time other than making sure that any correspondence sent to NZ is swiftly forwarded to you <u>and that no US person or entity accepts any correspondence that should be directed to NZ</u>.

(Emphasis added).

132. This email is another example of the fact that Katten knew that the Customer Service Entities had operations in the U.S. (hence the reference to a "U.S. person or entity"), but was advising that the Lending Entities simply should avoid service in the U.S., without recognizing that the Customer Service Entities faced direct liability under the CFPA.

133. Elsewhere in this email chain, in an email with Katten dated April 10, 2012, Moseley Sr. stated: "All our correspondence from NZ is swiftly forwarded to us and <u>all employees in our US office</u> have been instructed to not accept any correspondence addressed to any person or entity that should be directed to NZ." This email once again put Katten on notice that the Receivership Entities had a U.S. office, with U.S. employees (to whom New Zealand mail regarding the ongoing lending was being forwarded) and that Mosley Sr. controlled all these entities.

### 8. The Conclusion of the Representation

124. The status quo finally changed on or about September 6, 2012, when Moseley Sr. informed the Second Katten Associate that the New Zealand Lending Entities had lost their lending license a few days earlier.

125. On that same day, Callaway responded:

Rick –

[The Second Katten Associate] relayed to us that your New Zealand license has been suspended. I wanted to reach out to you and urge you not to have Hydra make loans without a valid lending license.

The business model that you have created with New Zealand counsel is premised on two factors to support arguments that United States law does not apply to it: that you are making loans from New Zealand pursuant to a valid lending license, <u>and that you have no operations in the United States</u>.

From your email to [the Second Katten Associate], it appear that you are saying your operations are NOT in New Zealand, and you don't have a lending license.

<u>We would not be able to represent you regarding any loans made without your FSP license, or where such loans are made through operations in the United States</u>.

Additionally, we are concerned that Hydra now has two complaints alleging that the borrowers did not sign (electronically or otherwise) a loan [sic] the loan agreement, but instead had monies deposited into their accounts.

Can you confirm what the actual practice is?

We would be happy to discuss these issues with you tomorrow at your convenience. Thank you

(Emphasis added).

126.    As detailed in the examples given above, as of the date Callaway sent this September 6, 2012 email (and dating back to 2009) Katten, in fact, knew that the Receivership Entities – specifically, the Customer Service Entities – did have operations in the U.S. This was, in fact, the crucial issue Katten failed to properly address in advising the Receivership Entities about their loan documents and general operational structure. Yet, it was only when the New Zealand lending license was lost that Katten suddenly raised this issue. And, even then, Katten's client file does not record any explanation being given that – as of July 2011, under the CFPA – the existence of *any* type of U.S. operations was a problem *regardless* of whether or not there was a foreign lending license.

127.    The next day, emails reflect that a conference call was held between the Katten attorneys (including Callaway) and Moseley Sr. Within days, Moseley Sr. retained new lead counsel for the Receivership Entities. Based on records recovered by the Receiver from the Receivership Entities, the reason for this was that Katten indicated it would not represent the Receivership Entities unless they had a lending license. There is no indication in the client file, however, that Katten advised the Receivership Entities of the specific defects in the loan documents under TILA, the EFTA, and the CFPA, or of the liability faced by the Customer Service Entities to the CFPB under the CFPA.

128.     According to Katten's time records, Katten last performed services for the Receivership Entities, for which it billed, in November 2012 (with the bill for those services being sent in December 2012). Katten's client file, however, does contain emails to Moseley Sr. about a contact by a State regulator regarding a Receivership Entity as late as January 2013. Katten's client file does not contain any letter terminating the representation.

129.     Nowhere in Katten's client file is there any record that Katten ever corrected its negligent and erroneous advice, discussed above, with regard to the application of TILA, the EFTA, or the CFPA to the Receivership Entities or their loan documents.

## COUNT I

## ATTORNEY MALPRACTICE

130.     The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

131.     At all relevant times, an attorney-client relationship existed between, on the one hand, Katten, and, on the other hand, the Lending Entities and Customer Service Entities.

132.     In the alternative, even if Katten only formed an attorney-client relationship with some of the Receivership Entities and not others, in the course of such a representation of some of the Receivership Entities, Katten performed services specifically intended to benefit all of the Receivership Entities, including but not limited to by: (a) reviewing, drafting, and revising the loan documents; and (b) advising the Receivership Entities regarding their overall structure and the application of U.S. law to such structure.

133.     Katten breached its professional and/or contractual duties to the Receivership Entities by failing to advise them that the loan documents they were using had to comply with TILA, the EFTA, and the CFPA once the CFPA went into effect, and by failing to advise the Customer Service Entities that they could be held liable to CFPB under the CFPA for violations in the loan documents of TILA, the EFTA, and the CFPA.

134.     As an actual and proximate cause of Katten's breaches of its duties, the Receivership Entities were harmed in an amount to be proven at trial, and including but not

limited to through the costs of defending the action by the CFPB (including the resulting receivership) and the ultimate liability the Receivership Entities will owe to the CFPB.

**COUNT II**

**BREACH OF FIDUCIARY DUTY**

135.    The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

136.    At all relevant times, an attorney-client relationship existed between, on the one hand, Katten, and, on the other hand, the Lending Entities and Customer Service Entities.

137.    In the alternative, even if Katten only formed an attorney-client relationship with some of the Receivership Entities and not others, in the course of such a representation of some of the Receivership Entities, Katten performed services specifically intended to benefit all of the Receivership Entities, including but not limited to by: (a) reviewing, drafting, and revising the loan documents; and (b) advising the Receivership Entities regarding their overall structure and the application of U.S. law to such structure.

138.    At all relevant times, Katten owed fiduciary obligations to the Lending Entities and Customer Service Entities.

139.    Katten breached its fiduciary obligations to the Receivership Entities by failing to advise them that the loan documents they were using had to comply with TILA, the EFTA, and the CFPA once the CFPA went into effect, and by failing to advise the Customer Service Entities that they could be held liable to CFPB under the CFPA for violations in the loan documents of TILA, the EFTA, and the CFPA.

140.    No other recognized tort encompasses the facts alleged.

141.    As an actual and proximate cause of Katten's breach of its fiduciary obligations, the Receivership Entities were harmed in an amount to be proven at trial, and including but not limited to through the costs of defending the action by the CFPB (including the resulting receivership) and the ultimate liability the Receivership Entities will owe to the CFPB.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment in its favor and against Defendant on Counts I and II of the Complaint and for relief as follows:

1.  For compensatory and actual damages in an amount to proven at trial;

2.  For pre- and post-judgment interest;

3.  For attorneys' fees, and costs, to the extent permitted by law; and

4.  For such other and further relief as the Court may deem proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury as to all causes of action herein.

Dated: November 11, 2016          Respectfully submitted,

**BARTLE & MARCUS LLC**

By: /s/David L. Marcus_____
      David L. Marcus, MO Bar No. 47846
      116 W. 47th Street, Suite 200
      Kansas City, Missouri 64112
      (816) 285-3888 (telephone)
      (816) 222-0534 (facsimile)
      dmarcus@bmlawkc.com

and

**MCNAMARA BENJAMIN LLC**

Daniel M. Benjamin (*pro hac pending*)
Charles G. La Bella (*pro hac pending*)
501 West Broadway, Suite 2020
San Diego, California 92101
Telephone:    619-269-0400
Facsimile:    619-269-0401
dbenjamin@mcnamarallp.com
clabella@cox.net

*Attorneys for Plaintiff*