# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| THOMAS W. MCNAMARA, as the Court-Appointed Receiver for SSM Group, LLC; CMG Group, LLC; Hydra Financial Limited Fund I; Hydra Financial Limited Fund II; Hydra Financial Limited Fund III; Hydra Financial Limited Fund IV; River Elk Services, LLC; OSL Marketing, Inc., a/k/a OSL Group, Inc.; and related subsidiaries and affiliates, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 4:16-cv-01203-SRB |
| KATTEN MUCHIN ROSENMAN LLP | ) ) ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Katten Muchin Rosenman LLP's Motion for Summary Judgment (Doc. #141), Katten Muchin Rosenman LLP's Motion for Partial Summary Judgment (Doc. #137), and Plaintiff's Motion for Summary Judgment on Defendant's Affirmative Defense Nos. 1 and 10 (Doc. #127).

For the following reasons, Katten Muchin Rosenman LLP's Motion for Summary Judgment (Doc. #141) is DENIED, Katten Muchin Rosenman LLP's Motion for Partial Summary Judgment (Doc. #137) is GRANTED IN PART and DENIED IN PART, and Plaintiff's Motion for Summary Judgment on Defendant's Affirmative Defenses Nos. 1 and 10 (Doc. #127) is GRANTED IN PART and DENIED IN PART.

## I.    Background

Richard Moseley Sr. ("Moseley") was the owner and operator of a payday lending operation that issued and serviced small, short-term loans, known as "payday loans," through the

internet to customers across the United States. The operation consisted of lending, marketing, and customer service entities. The lending entities were "shell corporations" incorporated under Nevis law until December 2011. In January 2012, new lending entities were incorporated under New Zealand law. The lending entities had no physical locations, operations, or employees overseas. The customer service and marketing entities were incorporated under Missouri law and physically located in Kansas City, Missouri. The customer service entities employed U.S.-based employees who processed and serviced loans and handled all other aspects of the payday lending operation. Correspondence sent to the overseas entities was collected by an overseas registered agent and forwarded back to the Kansas City-based offices. Until the spring of 2011, OSL Marketing, based in Kansas City, was used for loan servicing and processing. Subsequently, River Elk Services, also based in Kansas City, was formed to perform those tasks.

The payday lending operation generally functioned as follows. Potential borrowers would submit their personal information to a third-party website for loan consideration. A company called eData used the potential borrowers' information to create a loan packet, including a pre-filled loan agreement, and sent it electronically to the potential borrowers and to one of Moseley's companies. Then a customer service representative would call the potential borrowers to confirm whether they wanted the loan. The representative would either speak directly with the potential borrowers or leave a voicemail. Even if the representative did not speak directly with a potential borrower, the representative would approve the loan. Once the representative approved a loan, the loan would be sent to a third-party processer, at which point the loan would be funded and deposited in the borrower's bank account.

On June 27, 2018, Moseley was convicted in the United States District Court for the Southern District of New York and judgment was entered against him on 6 counts related to his

payday lending operation: Count 1, conspiracy to collect unlawful debts in violation of the

Racketeer Influenced and Corrupt Organizations Act ("RICO");[1] Count 2, collection of unlawful

debts in violation of RICO;[2] Count 3, conspiracy to commit wire fraud;[3] Count 4, wire fraud;[4]

Count 5, aggravated identity theft;[5] and Count 6, False TILA ("Truth in Lending Act")

disclosures.[6]  The Court determined that for the time period of 2008–2013, the payday lending

operation generated gross profits of $69,623,528.10.  The Court entered a money judgment

[1] Count 1 charged Moseley with participating in a conspiracy to violate the substantive RICO statute from at least in or about 2004 up to and including in or about September 2014.  Count 1 required the jury to find that a payday lending operation existed, that the operation engaged in or its activities affected interstate or foreign commerce, that Moseley was employed by or associated with the enterprise, and that Moseley knowingly and willfully agreed with at least one other person that either he or a coconspirator would participate, either directly or indirectly, in the conduct of the affairs of the enterprise through the collection of unlawful debt (a debt that is unenforceable because it carries an illegally high interest rate).  (Doc. #160-1, pp. 2296–2307).

[2] Count 2 charged Moseley with the substantive violation of RICO.  Count 2 required the jury to find that a payday lending operation existed, that the operation affected interstate commerce, that Moseley was associated with or employed by the operation, that Moseley engaged in the collection of an unlawful debt, and that Moseley willfully and knowingly conducted or participated in the conduct of the affairs of the operation through the collection of unlawful debt.  Under Count 2, the jury could also have found Moseley guilty if it found that another person committed the crime and that Moseley aided and abetted that person in the commission of the offense.  (Doc. #160-1, pp. 2307–12).

[3] Count 3 charged that Moseley participated in a conspiracy from at least in or about 2007 through in or about September 2014 to violate the federal statute that makes it unlawful to commit wire fraud by issuing loans to consumers that the consumers had not authorized and by then withdrawing payments from the consumers' bank accounts without their authorization.  Count 3 required the jury to find the existence of a conspiracy to commit wire fraud and that Moseley willfully and knowingly became a member of the conspiracy with the intent to further its illegal purpose.  (Doc. #160-1, pp. 2312–16).

[4] Count 4 charged that Moseley committed wire fraud from at least in or about 2007 through in or about September 2014.  Count 4 required the jury to find that in or about the times alleged in the indictment, there was a scheme or artifice to defraud others of money or property by false pretenses, representations, or promises; that Moseley knowingly and willfully devised or participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with the specific intent to defraud; and that in the execution of that scheme, Moseley used or caused the use by others of interstate or foreign wires.  Count 4 also charged Moseley with aiding and abetting the wire fraud offense.  (Doc. #160-1, pp. 2316–24).

[5] Count 5 charged that from at least in or about 2007 up to and including in or about September 2014, Moseley committed aggravated identity theft by transferring, possessing, or using the names and bank account numbers of other individuals in connection with the wire fraud offenses charged in Counts 3 and 4.  Count 5 required the jury to find that Moseley knowingly transferred, possessed, or used a means of identification of another person, during and in relation to the offense of wire fraud, and that Moseley acted knowingly and without lawful authority.  (Doc. #160-1, pp. 2324–28).

[6] Count 6 charged that from at least in or about 2004 through in or about 2014, Moseley willfully and knowingly gave false and inaccurate information and failed to provide information which he was required to disclose under TILA.  Count 6 required the jury to find that Moseley gave false and inaccurate information or failed to provide information, that the information was required to be disclosed under TILA, and that Moseley acted knowingly and willfully.  Count 6 also charged Moseley with aiding and abetting the false TILA disclosures.  (Doc. #160-1, pp. 2328–2330).

3

against Moseley in the amount of $49,000,000, representing the amount of proceeds traceable to the offenses charged in Counts 1–4.

On September 8, 2014, the Consumer Financial Protection Bureau ("CFPB") filed a six-count complaint in the Western District of Missouri against the payday lending entities (the "Receivership Entities"), Moseley, and other individuals involved in the payday lending operation for alleged violations of the Consumer Financial Protection Act ("CFPA"), TILA, and the Electronic Fund Transfer Act ("EFTA"). Specifically, the CFPB alleged 3 counts of CFPA violations: Count 1, misrepresentations that consumers authorized the loans and were bound by their terms; Count 2, misrepresentations about loan terms; Count 3, unfair billing practices. The CFPB alleged one TILA violation: Count 4, inaccurate loan term disclosures, and two violations of EFTA: Count 5, not obtaining authorization for electronic fund transfers; and Count 6, conditioning credit on preauthorized electronic fund transfers. The Court appointed Thomas McNamara as Receiver over the Receivership Entities to manage and exercise control of the Receivership Entities and their assets. The case was stayed during the resolution of the criminal proceedings against Moseley. The case settled after Moseley's conviction and a Stipulated Final Judgment and Order was entered on August 10, 2018, which included a monetary judgment of $69,623,528. The judgment was suspended against the defendants of the civil case upon satisfaction of certain conditions.

Katten Muchin Rosenman LLP ("Katten") formed an attorney-client relationship with OSL Marketing, one of the Receivership Entities, in August 2009. Katten's representation generally consisted of responding to inquiries from state regulators regarding the Receivership Entities' payday lending activities and advising Moseley regarding the structure of his operations and the loan documents he utilized. The attorney-client relationship terminated in 2012.

Receiver brings the present action against Katten, alleging Katten committed legal malpractice and breached its fiduciary duty to the Receivership Entities. Receiver alleges Katten gave negligent legal advice as to the applicability of TILA, EFTA, and CFPA to the Receivership Entities' operations.

As to TILA, Receiver alleges Katten failed to advise the Receivership Entities that they were legally bound by TILA and that therefore their loan documents were required to conform to TILA requirements. TILA requires that loan terms and costs disclosures be clear and accurate. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1999). The CFPB complaint alleges that the automatic renewal, or "auto-rollover" provision in the loan documents violated TILA. The disclosures in the "TILA box" on the loan documents assumed the consumer would repay the loan with a single simultaneous payment of principal, interest, and fees. The disclosure failed to clarify the automatic renewal term. The effect of this was that consumers' loans automatically rolled over and consumers incurred repeated finance charges without repayment of the principal. As to EFTA, Receiver alleges Katten failed to advise the Receivership Entities that they were legally bound by EFTA and that loan documents legally needed to conform to EFTA requirements. The CFPB complaint alleged the loan document provision conditioning the issuance of loans on the requirement that repayment be made by preauthorized electronic fund transfers (EFT or ACH processing) violated EFTA. 15 U.S.C. § 1693k(1); 12 C.F.R. § 1005.10(e)(1). As to CFPA, Receiver alleges Katten should have recognized that under the CFPA the customer service entities were liable for any of the lending entities' violations and should have advised the Receivership Entities that CFPA required the loan documents to comply with TILA and EFTA, which was enacted in July 2010 and went into effect no later than July

2011. Receiver alleges this negligent legal advice resulted in the civil suit *CFPB v. Moseley* and the Receivership Entities' joint and several liability on the resulting damages award.

Katten moves for summary judgment on two grounds: 1) Moseley's criminal conviction collaterally estops the Receiver's malpractice claims; and 2) undisputed facts demonstrate Katten did not act negligently and Receiver cannot prove "but for" causation. Katten moves in the alternative for partial summary judgment on two grounds: 1) Katten's negligence did not cause the Receivership Entities' unauthorized debits of consumers' bank accounts; and 2) the $69 million suspended judgment from the civil case is unrecoverable damage. Receiver moves for summary judgment on two of Katten's affirmative defenses: 1) *in pari delicto*; and 2) intervening cause.

## II.      Legal Standard

Federal Rule of Civil Procedure 56(a) requires a court to grant a motion for summary judgment if 1) the moving party "shows that there is no genuine dispute of material fact" and 2) the moving party is "entitled to judgment as a matter of law." A nonmoving party survives a summary judgment motion if the evidence, viewed in the light most favorable to the nonmoving party, is "such that a reasonable jury could return a verdict for the nonmoving party." *Stuart C. Irby Co. v. Tipton*, 796 F.3d 918, 922 (8th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). While a plaintiff opposing summary judgment "may not simply point to allegations in the complaint," *Robbins v. Becker*, 794 F.3d 988, 993 (8th Cir. 2015) (internal quotation marks and citation omitted), the "standard for avoiding summary judgment" is "relatively lenient." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 479–80 (2013) (citing *Anderson*, 477 U.S. at 248). The purpose of summary judgment "is not to cut litigants off from their right of trial by jury if they really have issues to try." *Hughes v. Am.*

6

*Jawa, Ltd.*, 529 F.2d 21, 23 (8th Cir. 1976) (internal quotation marks omitted) (quoting *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 467 (1962)).

## III.    Discussion

### A.    Collateral Estoppel

Katten argues Receiver is attempting to relitigate issues Moseley litigated and lost in his criminal case, and collateral estoppel bars Receiver's negligence claims against Katten. Katten argues that because the criminal investigation revealed Moseley acted knowingly and with criminal intent, Katten cannot be found negligent for failing to advise the Receivership Entities. Katten argues Moseley asserted an advice-of-counsel defense in his criminal case substantively identical to Receiver's negligence claim against Katten, which the jury rejected. Receiver argues in the first instance that Katten cannot rely on collateral estoppel at the summary judgment stage because it failed to plead it as an affirmative defense pursuant to Federal Rule of Civil Procedure 8(a). Receiver argues that even if Katten has not waived its collateral estoppel defense, the doctrine does not apply because Receiver was not a party or in privity with a party to the criminal proceedings and because the criminal proceedings did not necessarily and unambiguously resolve the questions presented in this case.

Collateral estoppel provides that "when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in another lawsuit." *Anderson v. Genuine Parts Co., Inc.*, 128 F.3d 1267, 1272 (8th Cir. 1997) (internal citation omitted). In the Eighth Circuit, collateral estoppel has five elements:

> (1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have been actually litigated in the prior action; (4) the issue sought to be precluded must have been determined by a valid and final judgment;

7

and (5) the determination in the prior action must have been essential to the prior judgment.

*Olsen v. Mukasey*, 541 F.3d 827, 830– 31 (8th Cir. 2008) (internal citations omitted).  Other Eighth Circuit cases state that the issue sought to be precluded must be *identical* to the issue decided in the previous case.  *See, e.g., Irving v. Dormire*, 586 F.3d 645, 648 (8th Cir. 2009); *Wellons, Inc. v. T.E. Ibberson Co.*, 869 F.2d 1166, 1168 (8th Cir. 1989) (emphasis added).

The Court finds that even if Katten adequately pleaded the collateral estoppel defense, it still fails.  The Court finds that Receiver, even while standing in the shoes of the Receivership Entities, is not in privity with Moseley as it relates to his criminal case and conviction.  "[A] person is in privity with a party . . . if the interests of the non-party are so closely related to the interests of the party, that the non-party can fairly be considered to have had his day in court." *Sumlin v. Krehbiel*, 876 F. Supp. 1080, 1081 (E.D. Mo. 1994) (citing *Gribben v. Lucky Star Ranch Corp.*, 623 F.Supp. 952, 960 (W.D. Mo.1985) (internal quotation marks omitted).  The Court presumes that Moseley's interest, like a defendant in any criminal case, centered chiefly on being found innocent and acquitted so that he could maintain his freedom and avoid imprisonment.  Alternatively, the interest of the Receivership Entities as a for-profit business operation, is presumably to continue operating for profit or to pay off their creditors, regardless of the status of their owner and operator.  While the Receivership Entities, like any business entity, would certainly be concerned with the criminal allegations and potential convictions of their owner and operator, their interest is one distinct and dissimilar from the criminal activities of their owner and operator.  "As a general rule, [c]orporations are treated as entities separate from their officers, directors, and shareholders for purposes of preclusion just as for other purposes. Without more, judgments entered in actions against any one of them are not binding on any other." *United States v. Gurley*, 43 F.3d 1188, 1197 (8th Cir. 1994) (internal citation and

8

quotation marks omitted); 18A Edward H. Cooper, *Federal Practice and Procedure* § 4460 (3d ed. 2019)). It cannot be fairly concluded that Receiver or the Receivership Entities have had their day in court through Moseley's criminal case.

Further, "[a] receiver is an officer of the court." *United States v. Smallwood*, 443 F.2d 535, 539 (8th Cir. 1971) (internal citation omitted). "He is not an agent or employee of either party to the litigation in which he was appointed." *Id.* "The appointment of the receiver remove[s] the wrongdoer from the scene." *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995); *see also Zayed v. Associated Bank, N.A.*, 779 F.3d 727, 737 (8th Cir. 2015) ("[B]ecause this case involves a Ponzi scheme, the Receivership Entities are considered victims of the fraud and thus creditors of the Ponzi scheme."). The Court appointed Receiver over the payday lending entities to manage their assets in order to ensure the Court's ability to afford monetary relief to consumers. The Court appointed Receiver on the belief that Moseley and other individuals previously in control of the Receivership Entities were not capable of responsibly and honestly managing the assets based on the criminal allegations underlying Moseley's criminal conviction. The Receiver then has no interest in defending Moseley from criminal charges. Rather, the Receiver's interest lies in sharp contrast: ensuring victims of Moseley's criminal enterprise obtain financial relief. Receiver as Plaintiff in this case, seeking to hold Katten liable for allegedly negligently advising the Receivership Entities and to recover monetary damages to benefit harmed consumers, cannot be said to have had its day in court based on Moseley's criminal trial. Under Katten's logic, Moseley's criminal conviction pardons Katten from liability for negligence in its attorney-client relationship with the Receivership Entities. The Court disagrees.

9

Even if Receiver and Moseley were in privity, the Court finds that the issue sought to be precluded in this case, whether Katten negligently advised the Receivership Entities regarding the applicability of TILA, EFTA, and CFPA, is not the same as the issues involved and actually litigated in the Moseley criminal case. The issues litigated in the Moseley criminal case concerned Moseley's criminal liability for conspiracy to collect and collection of unlawful debts in violation of RICO, conspiracy to commit and commission of wire fraud, aggravated identity theft, and false TILA disclosures spanning a time period of 2004–2014. The jury's guilty verdict on these issues established criminal liability regarding Moseley; the jury verdict did not establish whether Katten committed malpractice or breach of fiduciary duty for failure to advise the Receivership Entities for the 2009–2012 time period, resulting in the Receivership Entities' civil liability.

Katten argues that because the jury found Moseley acted knowingly and willfully in regard to the charges of conspiracy to commit and commission of wire fraud, aggravated identity theft, and false TILA disclosures, Katten could not have negligently advised the Receivership Entities. The jury's finding that Moseley acted knowingly and willfully does not equate to a finding that the Receivership Entities acted knowingly and willfully. *See Sequa Corp. v. Cooper*, 128 S.W.3d 69, 76 (Mo. Ct. App. 2003) ("Knowledge of an agent with regard to any business over which his authority reaches is notice, or knowledge, of the principal. The recognized exception to this rule is when the agent is acting adversely to the principal's interest.") (internal citation omitted); *F.D.I.C. v. O'Melveny & Myers*, 969 F.2d 744, 749 (9th Cir. 1992) (finding Receiver not estopped from bringing legal malpractice claim on behalf of corporation based on fraudulent acts of corporate officers) (reversed and remanded on other grounds). A finding that Katten breached a duty to the Receivership Entities resulting in the Receivership Entities' civil

liability is not precluded by a jury's finding that Moseley acted knowingly and willfully resulting in his criminal conviction.

Katten argues "[t]he Receivership Entities cannot relitigate in this action whether Moseley knowingly directed them to use materially misleading TILA disclosures or to engage in unauthorized ACH debits." (Doc. #143, p. 45). Katten argues that "[b]ecause the Receivership Entities cannot relitigate whether Moseley knowingly violated the law, the Receivership Entities cannot prove Moseley acted innocently or negligently based on Katten's advice." (Doc. #143, p. 45). Katten analogizes this case to, among others, *Juan v. Growe*, 547 S.W.3d 585, 595 (Mo. Ct. App. 2018). In *Growe*, the Missouri Court of Appeals held that the plaintiffs' claim that allegedly negligent legal advice to enter into a settlement agreement led to their criminal convictions and monetary judgment failed because their own criminal acts, not the negligence of their lawyers, led to their convictions and damages. The other cases cited by Katten hold the same.

Here, neither Receiver nor the Receivership Entities was a plaintiff in Moseley's criminal case. Further, Receiver does not seek a finding that Katten's negligence caused Moseley's criminal convictions and $49 million monetary judgment. Receiver seeks a finding that Katten's negligence led to the Receivership Entities' civil liability and the corresponding $69 million judgment. Moseley does not seek to relitigate his *mens rea* or seek to prove that he acted innocently or that Katten's negligence is to blame for his criminal conviction. Moseley is not a party to this action. Receiver seeks a finding that Katten acted negligently, which led not to Moseley's criminal convictions for RICO violations, wire fraud, aggravated identity theft, and false disclosures under TILA, but which led to the Receivership Entities' civil settlement and judgment entered against them for violations of TILA, EFTA, and CFPA.

11

Katten also argues that the jury's rejection of Moseley's advice-of-counsel defense precludes Receiver from claiming Katten acted negligently. The elements of an advice-of-counsel defense differ from the elements of malpractice and breach of fiduciary duty. The advice-of-counsel defense required a finding that Moseley, "before acting[,] [m]ade a full and complete good-faith report of all material facts to an attorney he or she considered competent; [r]eceived the attorney's advice as to the specific course of conduct that was followed; and [r]easonably relied upon that advice in good faith." (Doc. #160-1, p. 2335). The advice-of-counsel defense emphasizes the criminal defendant's actions of reporting material facts, receiving particular advice, and reasonably relying on the advice. Alternatively, a claim of malpractice or breach of fiduciary duty focuses not on the actions of the receiver of legal advice, but the giver of the advice. A legal malpractice claim requires the existence of an attorney-client relationship; negligence or breach of contract by the attorney, proximate cause, and damages. *Klemme v. Best*, 941 S.W.2d 493, 495 (Mo. 1997); *Richka Enterprises, Inc. v. American Family Mutual Ins. Co.*, 200 F.Supp.2d 1049, 1052 (E.D. Mo 2001). A claim for breach of fiduciary duty requires the same, plus that there is no other tort remedy. *Id.* The jury in Moseley's criminal case did not make a specific finding regarding Katten's attorney-client relationship with the Receivership Entities, what that attorney-client relationship agreement provided, whether Katten breached the agreement or its duty, and whether such breach proximately caused the Receivership Entities' civil liability and resulting damages based on violation of TILA, EFTA, and CFPA underlying *CFPB v. Moseley*.

The jury in Moseley's criminal case did not "actually litigate" the actions of Katten for the time period it represented the Receivership Entities, nor did the jury analyze the effect Katten's actions had on the Receivership Entities' civil liability. *Olsen*, 541 F.3d at 830. While

12

the Court acknowledges the relationship between Moseley's criminal case and the present negligence action between Receiver and Katten, the connection is too attenuated to satisfy the requirements of collateral estoppel. Accordingly, Receiver is not collaterally estopped from suing Katten for legal malpractice and breach of fiduciary duty, and Katten's motion for summary judgment in its favor on grounds of collateral estoppel is denied.

## B. Negligence

Katten argues there is no genuine dispute of material fact regarding whether Katten negligently advised the Receivership Entities. Katten argues that it advised Moseley on multiple occasions that the auto-rollover provision on the Receivership Entities' loan documents created regulatory risk, that the provision should be replaced with a single-payment structure, and that Moseley needed to move all operations offshore to escape liability under U.S. law for the Receivership Entities' operations. Katten argues it also consistently provided Moseley with loan agreement drafts that changed the auto-rollover term to a single-payment-in-full structure. Katten argues Moseley understood Katten's advice and knowingly rejected it.

Receiver argues that at no point during Katten's representation of the Receivership Entities did Katten explicitly tell Moseley that the loan agreements violated the law. Receiver argues that when Moseley was transitioning to New Zealand-based operations, he requested that Katten modify the loan documents and Katten failed to respond in a meaningful or timely way to Moseley. Receiver alleges that by the time Katten responded to him, he had been using an entirely different loan document. Receiver also argues that Katten was negligent in advising Moseley that the Receivership Entities could avoid complying with U.S. law by making loans through overseas shell corporations, even if his call center remained in the U.S., as long as the operation avoided the appearance of a relationship between the lenders and the call centers.

13

Receiver argues that, had Katten told Moseley that U.S. law applied regardless, he would have complied with U.S. law and avoided making unlawful loans.

A legal malpractice claim requires the existence of an attorney-client relationship, negligence or breach of contract by the attorney, proximate cause, and damages. *Klemme*, 941 S.W.2d at 495; *Richka*, 200 F.Supp.2d at 1052. A claim for breach of fiduciary duty requires the same, plus that there is no other tort remedy. *Id.* "A legal malpractice action thus is founded on an attorney's duty to exercise due care or to honor express contract commitments." *Id.* "In addition, an attorney has the basic fiduciary obligations of undivided loyalty and confidentiality." *Id.*

"Summary judgment is rarely appropriate in a negligence action because such a claim often encompasses a multitude of factual issues, and abstract concepts which become particularly elusive when applied to varying concrete situations." *Burk v. Thorson, Inc.*, 66 F. Supp. 2d 1069, 1073 (D. Minn. 1999) (citing *Hughes v. American Jawa, Ltd.*, 529 F.2d 21, 23 (8th Cir. 1976)). "Negligence is always a question for the jury when there is conflicting evidence on the issue or where, the facts being undisputed, reasonable minds could draw different conclusions therefrom." *Ross v. Presley*, 359 S.W.3d 156, 160 (Mo. App. S.D. 2012) (internal citation omitted). Whether a defendant breached its legal duty is a question of fact, "and unless no reasonable minds could draw different conclusions from the facts, the issue should be for the jury to decide." *Webb v. Adams*, 527 S.W.3d 121, 124 (Mo. App. E.D. 2017) (internal citations omitted). "Genuine issues of material fact as to the element of causation preclude[] summary judgment." *Ross*, 359 S.W.3d at 160.

The Court finds that a genuine dispute of material fact exists as to whether Katten breached its duty to the Receivership Entities. Viewing the evidence in the light most favorable

14

to Receiver as the nonmoving party, a reasonable jury could find that Katten breached its duty to the Receivership Entities by failing to advise explicitly that U.S. law applied to the Receivership Entities' operation and that the loan documents they were using violated the law. This dispute alone warrants denial of summary judgment. Katten argues that it repeatedly advised Moseley that his loan documents created regulatory risk. However, Katten identifies no place in the record that demonstrates Katten advised Moseley that his loan agreements in fact did not comply with applicable law. Katten relies heavily on time entries, billing records, deposition testimony, and declarations of Katten attorneys to support its argument that it sufficiently advised Moseley. None of these pieces of evidence show that Katten explicitly advised Moseley that the payday lending operation was bound by U.S. law. Beyond that, the billing records and time entries are at times significantly less detailed than the Katten attorneys' deposition testimony and declarations regarding the same matter. It is for the jury to decide whether it finds the testimony credible, whether it is corroborated by other evidence, and whether the evidence demonstrates Katten breached its legal duty to the Receivership Entities.

The record also reflects a dispute as to whether draft loan documents and emails Katten sent to Moseley sufficiently addressed the unlawful aspects of the loan documents. Receiver describes and supports with evidence more than one instance in which Katten sent a draft loan document to Moseley that suggested some changes to bring the document into compliance with U.S. law but failed to correct other noncompliant aspects. A jury, and not the Court, should decide whether such evidence demonstrates negligence on the part of Katten. Further, a reasonable jury could find that because Katten knew the OSL Marketing call center, with whom Katten was contracted to provide legal services, was located in Kansas City, Katten knew or should have known the payday lending operation was not completely offshore and accordingly,

15

had reason to know and explicitly advise Moseley that the loan documents in fact violated U.S. law.

Katten argues that Receiver's only argument is there was no written documentation corroborating the Katten attorneys' declarations and deposition testimony. Katten cites *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998), for the proposition that "if a moving party has demonstrated the absence of a genuine issue of material fact— meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole—concerns regarding the credibility of witnesses cannot defeat summary judgment." As discussed above, Receiver's argument is not limited to the credibility of Katten attorneys, and genuine issues of material fact remain for trial. A reasonable juror could infer from the evidence in the record that Katten failed to advise Moseley as to the Receivership Entities' need to comply with U.S. law and that the loan documents were unlawful as a result.

Katten argues it cannot be liable for Moseley's failure to use the loan documents Katten drafted in compliance with U.S. law. This argument ignores the allegation that Katten failed to advise Moseley explicitly that if he did not use such document, he would in fact be violating the law. It is for the jury to decide whether, if Katten had so advised Moseley, he would have used a legal loan document and the Receivership Entities would have avoided civil liability. Katten argues that if Moseley would have accepted Katten's advice to stop using the auto-rollover provision, the Receivership Entities would have avoided civil liability. This argument makes the same mistake and ignores the allegation that Katten's advice was insufficient in the first place. It is for the jury to decide what evidence to believe and whether Katten breached its duty to the Receivership Entities. Katten's motion for summary judgment on this point is denied.

16

### C. Unauthorized Loans

Katten argues that any alleged negligence in failing to advise the Receivership Entities on the unlawfulness of their loan documents did not cause unauthorized loans to be issued, and therefore Katten cannot be held liable for damages resulting from unauthorized loans. Katten argues that Moseley independently decided to issue loans to potential customers' bank accounts without their authorization by leaving voicemails on their phones and then issuing the loan without hearing back from the customer. Katten also argues there is no plausible connection between Katten's alleged negligence and unauthorized debits because, in the case of unauthorized debits, the loans were issued with no loan agreement, which precludes TILA, EFTA, and CFPA violations.

Receiver argues that every loan issued, even to customers who did not authorize the loans, was unlawfully accompanied by a false and deceptive TILA disclosure and a provision conditioning credit on preauthorized ACH. Receiver argues that in the absence of Katten's negligence, which caused all loans to be unlawful, the CFPB in the civil case would have been required to prove its claims for unauthorized lending. Receiver argues that the CFPB was able to avoid that task because ultimately, the authorization issue became a moot point; whether or not particular loans were authorized did not impact the lawfulness of the loans based on the loan documents that governed them all. Receiver argues that whether or not some of the loans were authorized did not impact the Receivership Entities' civil exposure.

Receiver stresses that the Stipulated Judgment in the civil case did not apportion the damages award between authorized and unauthorized loans. Receiver also argues that TILA and the corresponding Regulation Z require disclosures to be made before consummation of the loan, and therefore Katten became liable at the point potential borrowers viewed the pre-filled loan

17

agreements, regardless of whether they authorized the loans. Receiver also argues that under Missouri law and in other circuits, the acceptance of the loan benefits, which occurred when the loan was deposited into the borrowers' bank accounts, constitutes consummation, which means that a lack of authorization does not preclude Katten's liability.

"It is well-settled in Missouri that a plaintiff alleging legal malpractice has the burden of proving the existence of an attorney-client relationship, negligence by the attorney, proximate causation of plaintiff's damages, and damages." *SKMDV Holdings, Inc. v. Green Jacobson, P.C.*, 494 S.W.3d 537, 545 (Mo. Ct. App. E.D. 2016) (internal citations omitted). "Failure to prove any one of these elements defeats a claim for legal malpractice." *Id.*

"Proximate, or legal, cause is often described as a limitation on liability, absolving those actors whom it would be unfair to punish because of the attenuated relation that their conduct bears to the plaintiff's injury." *Id.* (internal citation and quotation marks omitted). "The most basic formulation of Missouri's proximate cause test is that conduct can constitute the proximate cause of any harm that is its 'natural and probable result.'" *Id.* "This has been described as a 'look back' test, in which the naturalness and probability of the result is assessed from the point in time after the injury has occurred." *Id.* "Foreseeability's role in the proximate cause analysis is widely understood as a limitation on liability." *Id.*

"A court properly interposes its judgment in this determination when the evidence reveals the existence of an intervening cause which eclipses the role the defendant's conduct played in the plaintiff's injury." *Id.* at 546. "An intervening cause breaks the chain of causation." *Id.* (citing *Collins v. Missouri Bar Plan*, 157 S.W.3d 726, 732 (Mo.App.W.D. 2005)). "For a later cause to intervene sufficiently to cut off another defendant's liability for prior negligence, the later cause must break the chain of events so that 'the result is no longer the natural and probable

consequence of the primary cause or one which ought to have been anticipated.'" *Id.* (citing

*Love v. Deere & Co.*, 684 S.W.2d 70, 75 (Mo.App. 1985).

Receiver argues that unauthorized loans led to TILA and EFTA violations, and thus led to civil liability for such violations in *CFPB v. Moseley*. Receiver argues that the unauthorized loan transactions were consummated for purposes of TILA and EFTA liability when the prospective borrowers "accepted" the funds deposited in their bank accounts without their consent. The Court rejects this argument. None of the case law Receiver cites in support holds that an unknowing and unconscious acceptance, procured by fraud, constitutes consummation.

Even assuming, however, that TILA and EFTA contemplate liability for unlawful loan documents that do not become part of a consummated loan agreement, Receiver does not argue that Katten had a duty to advise Moseley on the illegality of issuing unauthorized loans. Katten's relationship with the Receivership Entities generally involved advising on regulatory matters and on loan documents. That duty cannot be construed as one in which Katten should have detected the Receivership Entities' approving and funding unauthorized loans.

The Receiver's argument also fails because the customer service representatives' acts of approving, issuing, and funding loans without the prospective borrower's agreement and without even speaking to the prospective borrower is an intervening cause that "eclipsed the role [Katten's] conduct played in the Receivership Entities' injury." *SKMDV Holdings*, 494 S.W.3d at 545. At no point did Moseley or any other individual associated with the Receivership Entities directly or indirectly inform Katten about this fraudulent practice that resulted in a significant amount of unauthorized loans. As a matter of law, the risk that Moseley and the payday lending operation would use loan documents that Katten aided in drafting to fund loans customers never authorized was not a reasonable or probable consequence of Katten's alleged

negligence.  It would be "unfair to punish" Katten for the fraudulent issuance of unauthorized loans "because of the attenuated relation" that the loan agreements bear to the damages flowing therefrom.  *Id.*

While Receiver minimizes the reality that a large subset of the unlawful loans issued by the Receivership Entities were not authorized by the prospective borrower, that reality is more than a mere "additional infirmity."  Rather, the large number of unauthorized loans greatly expanded the Receivership Entities' civil liability.  The fact that the Stipulated Judgment did not separate out damages based on authorized or unauthorized loans does not preclude a finding of intervening cause, as Receiver argues.  Both parties have acknowledged the testimony from Moseley's criminal case addressing the proportionality of the damages award, as well as Katten's expert's testimony on the matter.  The Court anticipates Receiver's expert may be able to opine on the proportionality of the damage award as well.  Accordingly, Katten's motion for summary judgment in its favor on liability for unauthorized loans is granted.

### D.  Civil Judgment

Katten argues the $69 million Stipulated Judgment is unrecoverable damage because it is uncollectible and because it is suspended under its terms.  Katten also argues there is no evidence that the $69 million was reasonable mitigation, which it argues is required to prove damages in a case where the underlying claim was settled.  Katten further argues that statutes of limitations for TILA, EFTA, and CFPA lessen the amount of damages, as does the effective date of the CFPA and the window of time during which Katten represented the Receivership Entities.  Katten also argues the $69 million figure is unrecoverable profit from criminal acts.

Receiver argues the Stipulated Judgment is collectible because Receiver was not a plaintiff in the underlying civil action.  Receiver argues the terms of the Stipulated Judgment do

20

not deem the Stipulated Judgment uncollectible. Receiver argues it is not required to parse the settlement on a claim by claim basis and no proof of reasonableness is required. Further, Receiver argues Missouri Courts have held that an entry of judgment constitutes damages for statutes of limitation purposes, that the retroactive effect of the CFPA remains unclear to date, and that the damages flowing from the time period during which Katten represented the Receivership Entities exceed $69 million. Receiver also argues it is not seeking to recover from Moseley's criminal conviction, but from the civil settlement, in order to provide redress to affected customers.

"Settlements do not necessarily preclude damage claims." *SKMDV*, 494 S.W.3d at 548 (internal citation omitted). "Public policy favors settlements, and malpractice victims should not be completely precluded from . . . settling . . . underlying claim[s], particularly when the plaintiff can show that settlement was justified." *Id.* "Although a settlement of an underlying lawsuit injects some speculation into a claim for attorney malpractice, it does not preclude a plaintiff from proving malpractice so long as the plaintiff can establish a causal link between the alleged negligence and any loss incurred." *Id.* at 548–49. "In litigation cases, the plaintiff's obligation is to "prove that the settlement was necessary to mitigate . . . damages, . . . or that plaintiff was driven to the necessity of settling because, if the case had not been settled, plaintiff would have been worse off." *Id.* at 549 (internal citation and quotation marks omitted).

The Court disagrees with Katten's argument that because the Stipulated Judgment is suspended, meaning the Receivership Entities' liability on the Judgment is suspended, then Receiver cannot use the $69 million figure as a starting point for calculating damages. Katten cites to *Selimanovic v. Finney*, 337 S.W.3d 30, 33 (Mo. App. E.D. 2011). In *Selimanovic*, a wife hired an attorney to file a wrongful death suit against her husband's employer after he was killed

21

at work.  When the attorney failed to file a claim before the statute of limitations expired, the wife sued the attorney for legal malpractice.  The court found there was no collectible judgment because the co-employees who would have been liable for the wrongful death action had no assets to satisfy the judgment.  The court found that "if a wrongful death lawsuit had been filed and an adverse judgment had been entered against them, they would have had to claim bankruptcy; and the effect of bankruptcy would have been to clear an adverse judgment and prevent future garnishment to satisfy the judgment." *Id.*  There would also have been a workers' compensation lien on any recovery from the wrongful death action.

These are simply not the facts of this case.  The Stipulated Judgment damages award is not uncollectible; there is no language in the Stipulated Judgment that would prevent garnishment or describes any liens on the judgment.  Unlike in *Selimanovic*, there was a monetary judgment entered in the underlying civil action in this case.  In *Selimanovic*, Plaintiff was barred from even bringing a claim in the underlying action because the claim was barred by the statute of limitations.  The Stipulated Judgment is suspended, not uncollectible, as to the Defendants in the civil case, and in no way impacts Receiver's ability to collect on a malpractice claim from Katten.  Further, the Stipulated Judgment directs that if any defendant receives any funds from any source, the defendant is to turn the money over to be applied toward the Stipulated Judgment.

The Court also disagrees with Katten's characterization of the $69 million Stipulated Judgment as profit from criminal acts.  Moseley's criminal case was separate and apart from the civil case the CFPB brought against Moseley, other individuals, and the Receivership Entities.  That the $69 million damage calculation is borrowed from the criminal case does not make the civil judgment one of profit from criminal acts.  The Court does, however, recognize that a

22

portion of these damages are associated with the issuance of unauthorized loans caused by Moseley's fraud. As discussed further below, given the Court's finding related to unauthorized loans, the Court will address this issue in its order on the parties' *Daubert* motions.

None of the cases cited by Katten hold that Receiver's expert testimony needs to prove "reasonable mitigation." The test is whether "the settlement was *necessary* to mitigate . . . damages, . . . or that plaintiff was driven to the necessity of settling because, if the case had not been settled, plaintiff would have been worse off." *SKMDV*, 494 S.W.3d at 549 (emphasis added). Given the Court's finding that Katten cannot be liable for unauthorized loans, the Court will not analyze the parties' arguments regarding whether the civil settlement was necessary, considering much of the argument includes discussion of the expert reports and unauthorized loans. The Court recognizes the settlement was not apportioned based on unauthorized and authorized loans. The Court will address this issue in its order on the parties' *Daubert* motions. Katten's motion for summary judgment on the ground that the Stipulated Judgment is unrecoverable is denied.

### E. *In Pari Delicto*

Receiver argues summary judgment is proper in its favor on Katten's *in pari delicto* defense. Receiver argues *in pari delicto* does not apply to Receiver in this case because Receiver is acting for the benefit of consumers as a court-appointed equity receiver. Katten argues Receiver's claims are barred by *in pari delicto* because Receiver stands in the shoes of the Receivership Entities. Katten argues Moseley and the Receivership Entities' wrongdoing was deliberate, and a deliberate wrongdoer cannot recover for an illegal act in which it participated.

"Under the doctrine of *in pari delicto*, the legal counterpart of the equitable doctrine of unclean hands, 'a person cannot maintain an action if, in order to establish his cause of action, he

23

must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party.'" *Jo Ann Howard & Associates, P.C. v. Cassity ("Cassity II")*, 146 F. Supp. 3d 1089, 1097 (E.D. Mo. 2015) (quoting *Dobbs v. Dobbs Tire & Auto Centers, Inc.*, 969 S.W.2d 894, 897-98 (Mo. App. E.D. 1998)). "A party may not maintain a claim for damages, where the cause of action is based on an unlawful act or transaction in which both plaintiff and defendant participated." *Id.* "This is a principle founded upon [Missouri] public policy, not for the sake of the defendant, but for the law's sake, and that only." *Dobbs*, 969 S.W.2d at 897 (citations and internal quotation marks omitted).

"The appointment of the receiver remove[s] the wrongdoer from the scene." *Scholes*, 56 F.3d at 754; *see also Zayed*, 779 F.3d at 737 ("[B]ecause this case involves a Ponzi scheme, the Receivership Entities are considered victims of the fraud and thus creditors of the Ponzi scheme."). "[T]he receiver has the power to bring the claims on behalf of [the liquidating entity] and its creditors, not solely [the liquidating entity]." *Jo Ann Howard & Associates, P.C. v. Cassity ("Cassity I")*, 79 F. Supp. 3d 1001, 1017 n.13 (E.D. Mo. 2015). Receivers are acting on behalf of creditors as well as the entities who have committed the alleged wrongdoing, and "[w]hile the creditors may not be in the same category as innocent holders of notes, they occupy a status brought about by reliance upon . . . the corporation conforming to the law." *Joy v. Godchaux*, 35 F.2d 649, 656 (8th Cir. 1929); *see also F.D.I.C. v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995) ("[A] party may itself be denied a right or defense on account of its misdeeds, [but] there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law."). When the allegedly "corrupt officers have been removed from [the liquidating entity]

Case 4:16-cv-01203-SRB   Document 185   Filed 07/19/19   Page 24 of 26

and will not benefit from any recovery by [the Receiver] and the creditors of [the liquidating entity]," the rationale for *in pari delicto* disappears. *Cassity I*, 79 F. Supp. 3d at 1017.

The Court finds that the law has not changed since the Court denied Katten's two motions to dismiss this case on the basis of *in pari delicto*. Neither has discovery revealed new facts that would change the fact that *in pari delicto* does not apply to a court-appointed receiver bringing suit "in order to prevent any irreparable loss, damage, or injury to consumers or to creditors of the Receivership Defendants[.]" *CFPB v. Moseley*, No. 14-cv-00789-DW, Doc. #40, p. 24, ¶XV(D) (W.D. Mo. Oct. 3, 2014). Katten argues that discovery revealed "Moseley has not been removed from his position as an officer of the Receivership Entities," and "if Receiver recovers anything from Katten, it will directly benefit Moseley and the Receivership Entities." (Doc. #150, p. 58). The Court is not convinced by Katten's logic.

The reality that any recovery will pay down the amount owed on the suspended judgment is only incidental to the fact that the recovery will be turned over to the CFPB to benefit harmed consumers. The Court tasked the Receiver with instituting "actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Defendants[.]" *Id.* at ¶XV(L). The Court appointed the Receiver to "determine, adjust, and protect the interests of consumers and creditors who have transacted business with the Receivership Defendants." Id. at ¶XV(G). Any recovery will not line the pockets of Moseley or benefit the Receivership Entities, as the Receivership Entities are permanently restrained from conducting business in any way related to lending. As Katten admits, the judgment is suspended as to Moseley and the Receivership Entities; recovery toward the Stipulated Judgment benefits them in no way. Moseley and the Receivership Entities are "removed from the picture and . . . *in pari delicto* does not apply." *Kelley v. College of St.*

*Benedict*, 901 F. Supp. 2d 1123, 1129 (D. Minn. 2012).  Accordingly, Receiver's motion for summary judgment on Katten's *in pari delicto* defense is granted.

### F.  Intervening Cause

The Court ruled in Katten's favor on its motion for summary judgment on unauthorized loans, finding the Receivership Entities' act of approving and funding unauthorized loans was an intervening cause precluding Katten's liability related to unauthorized loans.  Accordingly, Receiver's motion for summary judgment in its favor on Katten's intervening cause defense is denied as moot.

### IV.  Conclusion

Accordingly, Katten Muchin Rosenman LLP's Motion for Summary Judgment (Doc. #141) is DENIED.  Katten Muchin Rosenman LLP's Motion for Partial Summary Judgment (Doc. #137) is GRANTED IN PART and DENIED IN PART.  Katten's motion for summary judgment on Receiver's claim that Katten's negligence caused the Receivership Entities' issuance of unauthorized loans is granted.  Katten's motion for summary judgment on Receiver's claims that the $69 million suspended Stipulated Judgment is recoverable damage is denied.  Plaintiff's Motion for Summary Judgment on Defendant's Affirmative Defenses Nos. 1 and 10 (Doc. #127) is GRANTED IN PART and DENIED IN PART.  Receiver's motion for summary judgment on Katten's *in pari delicto* defense is granted.  Receiver's motion for summary judgment on Katten's intervening cause defense is denied as moot.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH, JUDGE
UNITED STATES DISTRICT COURT

DATE: July 19, 2019

26